# UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC *v.* WEBER ET AL.

No. 78–432. Argued March 28, 1979—Decided June 27, 1979*

---

*Together with No. 78–435, *Kaiser Aluminum & Chemical Corp.* v. *Weber et al.*, and No. 78–436, *United States et al.* v. *Weber et al.*, also on certiorari to the same court.

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, 209. BURGER, C. J., filed a dissenting opinion, *post*, p. 216. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 219. POWELL and STEVENS, JJ., took no part in the consideration or decision of the cases.

*Michael H. Gottesman* argued the cause for petitioner in No. 78–432. With him on the briefs were *Robert M. Weinberg, Elliot Bredhoff, Bernard Kleiman, Carl Frankel, Jerome*

A. Cooper, John C. Falkenberry, J. Albert Woll, and Laurence Gold. Thompson Powers argued the cause for petitioner in No. 78–435. With him on the briefs was Jane McGrew. Deputy Solicitor General Wallace argued the cause for the United States et al., petitioners in No. 78–436. With him on the briefs were Solicitor General McCree, Assistant Attorney General Days, William C. Bryson, Brian K. Landsberg, and Robert J. Reinstein.

Michael R. Fontham argued the cause and filed a brief for respondent Weber in all cases.†

---

. †Briefs of amici curiae urging reversal in all cases were filed by Arthur Kinoy and Doris Peterson for the Affirmative Action Coordinating Center et al.; by E. Richard Larson, Burt Neuborne, and Frank Askin for the American Civil Liberties Union et al.; by Richard B. Sobol, Jerome Cohen, Harrison Combs, John Fillion, Winn Newman, Carole W. Wilson, David Rubin, John Tadlock, James E. Youngdahl, A. L. Zwerdling, and Janet Kohn for the American Federation of State, County and Municipal Employees, AFL–CIO, et al.; by Samuel Yee, Charles Stephen Ralston, and Bill Lann Lee for the Asian American Legal Defense and Education Fund et al.; by James F. Miller and Stephen V. Bomse for the California Fair Employment Practice Commission et al.; by Charles A. Bane, Thomas D. Barr, Norman Redlich, Robert A. Murphy, Richard T. Seymour, Norman J. Chachkin, and Richard S. Kohn for the Lawyers' Committee for Civil Rights Under Law; by Nathaniel R. Jones for the National Association for the Advancement of Colored People; by Jack Greenberg, James M. Nabrit III, Eric Schnapper, Lowell Johnston, Barry L. Goldstein, Vernon E. Jordan, Jr., and Wiley A. Branton for the N. A. A. C. P. Legal Defense and Educational Fund, Inc., et al.; by Herbert O. Reid and John W. Davis for the National Medical Association, Inc., et al.; by Robert Hermann and Evan A. Davis for the National Puerto Rican Coalition et al.; by Jerome Tauber for the National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO; and by Eileen M. Stein and Pat Eames for Patricia Schroeder et al. Sybille C. Fritzsche filed a brief for the Women's Caucus, District 31 of the United Steelworkers of America, as amicus curiae in No. 78–432 urging reversal.

Briefs of amici curiae urging affirmance in all cases were filed by J. D. Burdick and Ronald E. Yank for the California Correctional Officers Association; by Gerard C. Smetana for the Government Contract Employers Association; by Ronald A. Zumbrun and John H. Findley for the Pacific

Mr. Justice Brennan delivered the opinion of the Court.

Challenged here is the legality of an affirmative action plan—collectively bargained by an employer and a union—that reserves for black employees 50% of the openings in an in-plant craft-training program until the percentage of black craftworkers in the plant is commensurate with the percentage of blacks in the local labor force. The question for decision is whether Congress, in Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, left employers and unions in the private sector free to take such race-conscious steps to eliminate manifest racial imbalances in traditionally segregated job categories. We hold that Title VII does not prohibit such race-conscious affirmative action plans.

I

In 1974, petitioner United Steelworkers of America (USWA) and petitioner Kaiser Aluminum & Chemical Corp. (Kaiser)

---

Legal Foundation; by *Leonard F. Walentynowicz* for the Polish American Congress et al.; and by *Wayne T. Elliott* for the Southeastern Legal Foundation, Inc. *Jack N. Rogers* filed a brief for the United States Justice Foundation as *amicus curiae* in No. 78–432 urging affirmance.

Briefs of *amici curiae* in all cases were filed by *Vilma S. Martinez, Morris J. Baller,* and *Joel G. Contreras* for the American G. I. Forum et al.; by *Philip B. Kurland, Larry M. Lavinsky, Arnold Forster, Harry J. Keaton, Meyer Eisenberg, Justin J. Finger, Jeffrey P. Sinensky, Richard A. Weisz, Themis N. Anastos, Dennis Rapps,* and *Julian E. Kulas* for the Anti-Defamation League of B'nai B'rith et al.; by *John W. Finley, Jr., Michael Blinick, Deyan R. Brashich,* and *Eugene V. Rostow* for the Committee on Academic Nondiscrimination and Integrity; by *Kenneth C. McGuiness, Robert E. Williams,* and *Douglas S. McDowell* for the Equal Employment Advisory Council; by *Mark B. Bigelow* for the National Coordinating Committee for Trade Union Action and Democracy; by *Philips B. Patton* for the Pacific Civil Liberties League; by *Frank J. Donner* for the United Electrical, Radio and Machine Workers of America; by *Paul D. Kamenar* for the Washington Legal Foundation; and by *Gloria R. Allred* for the Women's Equal Rights Legal Defense and Education Fund. *Burt Pines* and *Cecil W. Marr* filed a brief for the city of Los Angeles as *amicus curiae* in No. 78–435.

entered into a master collective-bargaining agreement covering terms and conditions of employment at 15 Kaiser plants. The agreement contained, *inter alia*, an affirmative action plan designed to eliminate conspicuous racial imbalances in Kaiser's then almost exclusively white craftwork forces. Black craft-hiring goals were set for each Kaiser plant equal to the percentage of blacks in the respective local labor forces. To enable plants to meet these goals, on-the-job training programs were established to teach unskilled production workers—black and white—the skills necessary to become craftworkers. The plan reserved for black employees 50% of the openings in these newly created in-plant training programs.

This case arose from the operation of the plan at Kaiser's plant in Gramercy, La. Until 1974, Kaiser hired as craftworkers for that plant only persons who had had prior craft experience. Because blacks had long been excluded from craft unions,[1] few were able to present such credentials. As a consequence, prior to 1974 only 1.83% (5 out of 273) of the skilled craftworkers at the Gramercy plant were black,

---

[1] Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice. See, *e. g.*, *United States* v. *Elevator Constructors*, 538 F. 2d 1012 (CA3 1976); *Associated General Contractors of Massachusetts* v. *Altschuler*, 490 F. 2d 9 (CA1 1973); *Southern Illinois Builders Assn.* v. *Ogilvie*, 471 F. 2d 680 (CA7 1972); *Contractors Assn. of Eastern Pennsylvania* v. *Secretary of Labor*, 442 F. 2d 159 (CA3 1971); *Insulators & Asbestos Workers* v. *Vogler*, 407 F. 2d 1047 (CA5 1969); *Buckner* v. *Goodyear Tire & Rubber Co.*, 339 F. Supp. 1108 (ND Ala. 1972), aff'd without opinion, 476 F. 2d 1287 (CA5 1973). See also U. S. Commission on Civil Rights, The Challenge Ahead: Equal Opportunity in Referral Unions 58–94 (1976) (summarizing judicial findings of discrimination by craft unions); G. Myrdal, An American Dilemma 1079–1124 (1944); F. Marshall & V. Briggs, The Negro and Apprenticeship (1967); S. Spero & A. Harris, The Black Worker (1931); U. S. Commission on Civil Rights, Employment 97 (1961); State Advisory Committees, U. S. Commission on Civil Rights, 50 States Report 209 (1961); Marshall, The Negro in Southern Unions, in The Negro and the American Labor Movement 145 (J. Jacobson ed. 1968); App. 63, 104.

even though the work force in the Gramercy area was approximately 39% black.

Pursuant to the national agreement Kaiser altered its craft-hiring practice in the Gramercy plant. Rather than hiring already trained outsiders, Kaiser established a training program to train its production workers to fill craft openings. Selection of craft trainees was made on the basis of seniority, with the proviso that at least 50% of the new trainees were to be black until the percentage of black skilled craftworkers in the Gramercy plant approximated the percentage of blacks in the local labor force. See 415 F. Supp. 761, 764.

During 1974, the first year of the operation of the Kaiser-USWA affirmative action plan, 13 craft trainees were selected from Gramercy's production work force. Of these, seven were black and six white. The most senior black selected into the program had less seniority than several white production workers whose bids for admission were, rejected. Thereafter one of those white production workers, respondent Brian Weber (hereafter respondent), instituted this class action in the United States District Court for the Eastern District of Louisiana.

The complaint alleged that the filling of craft trainee positions at the Gramercy plant pursuant to the affirmative action program had resulted in junior black employees' receiving training in preference to senior white employees, thus discriminating against respondent and other similarly situated white employees in violation of §§ 703 (a) [2] and

---

[2] Section 703 (a), 78 Stat. 255, as amended, 86 Stat. 109, 42 U. S. C. § 2000e-2 (a), provides:

"(a) . . . It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individ-

(d)³ of Title VII. The District Court held that the plan violated Title VII, entered a judgment in favor of the plaintiff class, and granted a permanent injunction prohibiting Kaiser and the USWA "from denying plaintiffs, Brian F. Weber and all other members of the class, access to on-the-job training programs on the basis of race." App. 171. A divided panel of the Court of Appeals for the Fifth Circuit affirmed, holding that all employment preferences based upon race, including those preferences incidental to bona fide affirmative action plans, violated Title VII's prohibition against racial discrimination in employment. 563 F. 2d 216 (1977). We granted certiorari. 439 U. S. 1045 (1978). We reverse.

## II

We emphasize at the outset the narrowness of our inquiry. Since the Kaiser-USWA plan does not involve state action, this case does not present an alleged violation of the Equal Protection Clause of the Fourteenth Amendment. Further, since the Kaiser-USWA plan was adopted voluntarily, we are not concerned with what Title VII requires or with what a court might order to remedy a past proved violation of the Act. The only question before us is the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the Kaiser-USWA plan. That question was

---

ual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

³ Section 703 (d), 78 Stat. 256, 42 U. S. C. § 2000e-2 (d), provides:

"It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

expressly left open in *McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273, 281 n. 8 (1976), which held, in a case not involving affirmative action, that Title VII protects whites as well as blacks from certain forms of racial discrimination.

Respondent argues that Congress intended in Title VII to prohibit all race-conscious affirmative action plans. Respondent's argument rests upon a literal interpretation of §§ 703 (a) and (d) of the Act. Those sections make it unlawful to "discriminate . . . because of . . . race" in hiring and in the selection of apprentices for training programs. Since, the argument runs, *McDonald* v. *Santa Fe Trail Transp. Co., supra,* settled that Title VII forbids discrimination against whites as well as blacks, and since the Kaiser-USWA affirmative action plan operates to discriminate against white employees solely because they are white, it follows that the Kaiser-USWA plan violates Title VII.

Respondent's argument is not without force. But it overlooks the significance of the fact that the Kaiser-USWA plan is an affirmative action plan voluntarily adopted by private parties to eliminate traditional patterns of racial segregation. In this context respondent's reliance upon a literal construction of §§ 703 (a) and (d) and upon *McDonald* is misplaced. See *McDonald* v. *Santa Fe Trail Transp. Co., supra,* at 281 n. 8. It is a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459 (1892). The prohibition against racial discrimination in §§ 703 (a) and (d) of Title VII must therefore be read against the background of the legislative history of Title VII and the historical context from which the Act arose. See *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1, 10 (1976); *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 620 (1967); *United States* v. *American Trucking Assns.,* 310 U. S. 534, 543–544 (1940). Examination of those sources makes

clear that an interpretation of the sections that forbade all race-conscious affirmative action would "bring about an end completely at variance with the purpose of the statute" and must be rejected. *United States* v. *Public Utilities Comm'n,* 345 U. S. 295, 315 (1953). See *Johansen* v. *United States,* 343 U. S. 427, 431 (1952); *Longshoremen* v. *Juneau Spruce Corp.,* 342 U. S. 237, 243 (1952); *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426 (1907).

Congress' primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was with "the plight of the Negro in our economy." 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey). Before 1964, blacks were largely relegated to "unskilled and semi-skilled jobs." *Ibid.* (remarks of Sen. Humphrey); *id.,* at 7204 (remarks of Sen. Clark); *id.,* at 7379–7380 (remarks of Sen. Kennedy). Because of automation the number of such jobs was rapidly decreasing. See *id.,* at 6548 (remarks of Sen. Humphrey); *id.,* at 7204 (remarks of Sen. Clark). As a consequence, "the relative position of the Negro worker [was] steadily worsening. In 1947 the nonwhite unemployment rate was only 64 percent higher than the white rate; in 1962 it was 124 percent higher." *Id.,* at 6547 (remarks of Sen. Humphrey). See also *id.,* at 7204 (remarks of Sen. Clark). Congress considered this a serious social problem. As Senator Clark told the Senate:

"The rate of Negro unemployment has gone up consistently as compared with white unemployment for the past 15 years. This is a social malaise and a social situation which we should not tolerate. That is one of the principal reasons why the bill should pass." *Id.,* at 7220.

Congress feared that the goals of the Civil Rights Act— the integration of blacks into the mainstream of American society—could not be achieved unless this trend were reversed. And Congress recognized that that would not be possible

unless blacks were able to secure jobs "which have a future." *Id.,* at 7204 (remarks of Sen. Clark). See also *id.,* at 7379–7380 (remarks of Sen. Kennedy). As Senator Humphrey explained to the Senate:

> "What good does it do a Negro to be able to eat in a fine restaurant if he cannot afford to pay the bill? What good does it do him to be accepted in a hotel that is too expensive for his modest income? How can a Negro child be motivated to take full advantage of integrated educational facilities if he has no hope of getting a job where he can use that education?" *Id.,* at 6547.

> "Without a job, one cannot afford public convenience and accommodations. Income from employment may be necessary to further a man's education, or that of his children. If his children have no hope of getting a good job, what will motivate them to take advantage of educational opportunities?" *Id.,* at 6552.

These remarks echoed President Kennedy's original message to Congress upon the introduction of the Civil Rights Act in 1963.

> "There is little value in a Negro's obtaining the right to be admitted to hotels and restaurants if he has no cash in his pocket and no job." 109 Cong. Rec. 11159.

Accordingly, it was clear to Congress that "[t]he crux of the problem [was] to open employment opportunities for Negroes in occupations which have been traditionally closed to them," 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey), and it was to this problem that Title VII's prohibition against racial discrimination in employment was primarily addressed.

It plainly appears from the House Report accompanying the Civil Rights Act that Congress did not intend wholly to prohibit private and voluntary affirmative action efforts as one method of solving this problem. The Report provides:

> "No bill can or should lay claim to eliminating all of

the causes and consequences of racial and other types of discrimination against minorities. There is reason to believe, however, that national leadership provided by the enactment of Federal legislation dealing with the most troublesome problems *will create an atmosphere conducive to voluntary or local resolution of other forms of discrimination.*" H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, p. 18 (1963). (Emphasis supplied.)

Given this legislative history, we cannot agree with respondent that Congress intended to prohibit the private sector from taking effective steps to accomplish the goal that Congress designed Title VII to achieve. The very statutory words intended as a spur or catalyst to cause "employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history," *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 418 (1975), cannot be interpreted as an absolute prohibition against all private, voluntary, race-conscious affirmative action efforts to hasten the elimination of such vestiges.[4] It would be ironic indeed if a law triggered by a Nation's concern over centuries of racial injustice and intended to improve the lot of those who had "been excluded from the American dream for so long," 110 Cong. Rec. 6552 (1964) (remarks of Sen. Humphrey), constituted the first legislative prohibition of all voluntary, private, race-conscious efforts to abolish traditional patterns of racial segregation and hierarchy.

Our conclusion is further reinforced by examination of the

---

[4] The problem that Congress addressed in 1964 remains with us. In 1962, the nonwhite unemployment rate was 124% higher than the white rate. See 110 Cong. Rec. 6547 (1964) (remarks of Sen. Humphrey). In 1978, the black unemployment rate was 129% higher. See Monthly Labor Review, U. S. Department of Labor, Bureau of Labor Statistics 78 (Mar. 1979).

language and legislative history of § 703 (j) of Title VII.[5] Opponents of Title VII raised two related arguments against the bill. First, they argued that the Act would be interpreted to *require* employers with racially imbalanced work forces to grant preferential treatment to racial minorities in order to integrate. Second, they argued that employers with racially imbalanced work forces would grant preferential treatment to racial minorities, even if not required to do so by the Act. See 110 Cong. Rec. 8618–8619 (1964) (remarks of Sen. Sparkman). Had Congress meant to prohibit all race-conscious affirmative action, as respondent urges, it easily could have answered both objections by providing that Title VII would not require or *permit* racially preferential integration efforts. But Congress did not choose such a course. Rather, Congress added § 703 (j) which addresses only the first objection. The section provides that nothing contained in Title VII "shall be interpreted to *require* any

---

[5] Section 703 (j) of Title VII, 78 Stat. 257, 42 U. S. C. § 2000e–2 (j), provides:

"Nothing contained in this title shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

Section 703 (j) speaks to substantive liability under Title VII, but it does not preclude courts from considering racial imbalance as evidence of a Title VII violation. See *Teamsters* v. *United States*, 431 U. S. 324, 339–340, n. 20 (1977). Remedies for substantive violations are governed by § 706 (g), 42 U. S. C. § 2000e–5 (g).

employer . . . to grant preferential treatment . . . to any group because of the race . . . of such . . . group on account of" a *de facto* racial imbalance in the employer's work force. The section does *not* state that "nothing in Title VII shall be interpreted to *permit*" voluntary affirmative efforts to correct racial imbalances. The natural inference is that Congress chose not to forbid all voluntary race-conscious affirmative action.

The reasons for this choice are evident from the legislative record. Title VII could not have been enacted into law without substantial support from legislators in both Houses who traditionally resisted federal regulation of private business. Those legislators demanded as a price for their support that "management prerogatives, and union freedoms . . . be left undisturbed to the greatest extent possible." H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 29 (1963). Section 703 (j) was proposed by Senator Dirksen to allay any fears that the Act might be interpreted in such a way as to upset this compromise. The section was designed to prevent § 703 of Title VII from being interpreted in such a way as to lead to undue "Federal Government interference with private businesses because of some Federal employee's ideas about racial balance or racial imbalance." 110 Cong. Rec. 14314 (1964) (remarks of Sen. Miller).[6] See also *id.,* at 9881 (remarks of

---

[6] Title VI of the Civil Rights Act of 1964, considered in *University of California Regents* v. *Bakke,* 438 U. S. 265 (1978), contains no provision comparable to § 703 (j). This is because Title VI was an exercise of federal power over a matter in which the Federal Government was already directly involved: the prohibitions against race-based conduct contained in Title VI governed "program[s] or activit[ies] receiving Federal financial assistance." 42 U. S. C. § 2000d. Congress was legislating to assure federal funds would not be used in an improper manner. Title VII, by contrast, was enacted pursuant to the commerce power to regulate purely private decisionmaking and was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments. Title VII and Title VI, therefore, cannot be read *in pari materia.* See 110 Cong. Rec. 8315 (1964) (remarks of Sen. Cooper). See also *id.,* at 11615 (remarks of Sen. Cooper).

Sen. Allott); *id.*, at 10520 (remarks of Sen. Carlson); *id.*, at 11471 (remarks of Sen. Javits); *id.*, at 12817 (remarks of Sen. Dirksen). Clearly, a prohibition against all voluntary, race-conscious, affirmative action efforts would disserve these ends. Such a prohibition would augment the powers of the Federal Government and diminish traditional management preroga-tives while at the same time impeding attainment of the ulti-mate statutory goals. In view of this legislative history and in view of Congress' desire to avoid undue federal regulation of private businesses, use of the word "require" rather than the phrase "require or permit" in § 703 (j) fortifies the conclu-sion that Congress did not intend to limit traditional business freedom to such a degree as to prohibit all voluntary, race-conscious affirmative action.[7]

---

[7] Respondent argues that our construction of § 703 conflicts with vari-ous remarks in the legislative record. See, *e. g.*, 110 Cong. Rec. 7213 (1964) (Sens. Clark and Case); *id.*, at 7218 (Sens. Clark and Case); *id.*, at 6549 (Sen. Humphrey); *id.*, at 8921 (Sen. Williams). We do not agree. In Senator Humphrey's words, these comments were intended as assurances that Title VII would not allow establishment of systems "to *maintain* racial balance in employment." *Id.*, at 11848 (emphasis added). They were not addressed to temporary, voluntary, affirmative action measures undertaken to eliminate manifest racial imbalance in traditionally segre-gated job categories. Moreover, the comments referred to by respondent all preceded the adoption of § 703 (j), 42 U. S. C. § 2000e–2 (j). After § 703 (j) was adopted, congressional comments were all to the effect that employers would not be *required* to institute preferential quotas to avoid Title VII liability, see, *e. g.*, 110 Cong. Rec. 12819 (1964) (remarks of Sen. Dirksen); *id.*, at 13079–13080 (remarks of Sen. Clark); *id.*, at 15876 (remarks of Rep. Lindsay). There was no suggestion after the adoption of § 703 (j) that wholly voluntary, race-conscious, affirmative action efforts would in themselves constitute a violation of Title VII. On the contrary, as Representative MacGregor told the House shortly before the final vote on Title VII:

"Important as the scope and extent of this bill is, it is also vitally important that all Americans understand what this bill does not cover.

"Your mail and mine, your contacts and mine with our constituents, indicates a great degree of misunderstanding about this bill. People com-

We therefore hold that Title VII's prohibition in §§ 703 (a) and (d) against racial discrimination does not condemn all private, voluntary, race-conscious affirmative action plans.

### III

We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged Kaiser-USWA affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to "open employment opportunities for Negroes in occupations which have been traditionally closed to them." 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey).[8]

At the same time, the plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hires. Cf. *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976). Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the

---

plain about . . . preferential treatment or quotas in employment. There is a mistaken belief that Congress is legislating in these areas in this bill. When we drafted this bill we excluded these issues largely because the problems raised by these controversial questions are more properly handled at a governmental level closer to the American people and by communities and individuals themselves." 110 Cong. Rec. 15893 (1964).

[8] See n. 1, *supra*. This is not to suggest that the freedom of an employer to undertake race-conscious affirmative action efforts depends on whether or not his effort is motivated by fear of liability under Title VII.

percentage of blacks in the local labor force. See 415 F. Supp., at 763.

We conclude, therefore, that the adoption of the Kaiser-USWA plan for the Gramercy plant falls within the area of discretion left by Title VII to the private sector voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance in traditionally segregated job categories.[9] Accordingly, the judgment of the Court of Appeals for the Fifth Circuit is

*Reversed.*

MR. JUSTICE POWELL and MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. JUSTICE BLACKMUN, concurring.

While I share some of the misgivings expressed in MR. JUSTICE REHNQUIST's dissent, *post,* p. 219, concerning the extent to which the legislative history of Title VII clearly supports the result the Court reaches today, I believe that additional considerations, practical and equitable, only partially perceived, if perceived at all, by the 88th Congress, support the conclusion reached by the Court today, and I therefore join its opinion as well as its judgment.

I

In his dissent from the decision of the United States Court of Appeals for the Fifth Circuit, Judge Wisdom pointed out that this litigation arises from a practical problem in the administration of Title VII. The broad prohibition against discrimination places the employer and the union on what he ac-

---

[9] Our disposition makes unnecessary consideration of petitioners' argument that their plan was justified because they feared that black employees would bring suit under Title VII if they did not adopt an affirmative action plan. Nor need we consider petitioners' contention that their affirmative action plan represented an attempt to comply with Exec. Order No. 11246, 3 CFR 339 (1964–1965 Comp.).

curately described as a "high tightrope without a net beneath them." 563 F. 2d 216, 230. If Title VII is read literally, on the one hand they face liability for past discrimination against blacks, and on the other they face liability to whites for any voluntary preferences adopted to mitigate the effects of prior discrimination against blacks.

In this litigation, Kaiser denies prior discrimination but concedes that its past hiring practices may be subject to question. Although the labor force in the Gramercy area was approximately 39% black, Kaiser's work force was less than 15% black, and its craftwork force was less than 2% black. Kaiser had made some effort to recruit black painters, carpenters, insulators, and other craftsmen, but it continued to insist that those hired have five years' prior industrial experience, a requirement that arguably was not sufficiently job related to justify under Title VII any discriminatory impact it may have had. See *Parson* v. *Kaiser Aluminum & Chemical Corp.*, 575 F. 2d 1374, 1389 (CA5 1978), cert. denied *sub nom. Steelworkers* v. *Parson,* 441 U. S. 968 (1979). The parties dispute the extent to which black craftsmen were available in the local labor market. They agree, however, that after critical reviews from the Office of Federal Contract Compliance, Kaiser and the Steelworkers established the training program in question here and modeled it along the lines of a Title VII consent decree later entered for the steel industry. See *United States* v. *Allegheny-Ludlum Industries, Inc.,* 517 F. 2d 826 (CA5 1975). Yet when they did this, respondent Weber sued, alleging that Title VII prohibited the program because it discriminated against him as a white person and it was not supported by a prior judicial finding of discrimination against blacks.

Respondent Weber's reading of Title VII, endorsed by the Court of Appeals, places voluntary compliance with Title VII in profound jeopardy. The only way for the employer and the union to keep their footing on the "tightrope" it creates would be to eschew all forms of voluntary affirmative action. Even

a whisper of emphasis on minority recruiting would be forbidden. Because Congress intended to encourage private efforts to come into compliance with Title VII, see *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 44 (1974), Judge Wisdom concluded that employers and unions who had committed "arguable violations" of Title VII should be free to make reasonable responses without fear of liability to whites. 563 F. 2d, at 230. Preferential hiring along the lines of the Kaiser program is a reasonable response for the employer, whether or not a court, on these facts, could order the same step as a remedy. The company is able to avoid identifying victims of past discrimination, and so avoids claims for backpay that would inevitably follow a response limited to such victims. If past victims should be benefited by the program, however, the company mitigates its liability to those persons. Also, to the extent that Title VII liability is predicated on the "disparate effect" of an employer's past hiring practices, the program makes it less likely that such an effect could be demonstrated. Cf. *County of Los Angeles* v. *Davis,* 440 U. S. 625, 633-634 (1979) (hiring could moot a past Title VII claim). And the Court has recently held that work-force statistics resulting from private affirmative action were probative of benign intent in a "disparate treatment" case. *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 579-580 (1978).

The "arguable violation" theory has a number of advantages. It responds to a practical problem in the administration of Title VII not anticipated by Congress. It draws predictability from the outline of present law and closely effectuates the purpose of the Act. Both Kaiser and the United States urge its adoption here. Because I agree that it is the soundest way to approach this case, my preference would be to resolve this litigation by applying it and holding that Kaiser's craft training program meets the requirement that voluntary affirmative action be a reasonable response to an "arguable violation" of Title VII.

## II

The Court, however, declines to consider the narrow "arguable violation" approach and adheres instead to an interpretation of Title VII that permits affirmative action by an employer whenever the job category in question is "traditionally segregated." *Ante,* at 209, and n. 9. The sources cited suggest that the Court considers a job category to be "traditionally segregated" when there has been a societal history of purposeful exclusion of blacks from the job category, resulting in a persistent disparity between the proportion of blacks in the labor force and the proportion of blacks among those who hold jobs within the category.*

"Traditionally segregated job categories," where they exist, sweep far more broadly than the class of "arguable violations" of Title VII. The Court's expansive approach is somewhat

---

*The jobs in question here include those of carpenter, electrician, general repairman, insulator, machinist, and painter. App. 165. The sources cited, *ante,* at 198 n. 1, establish, for example, that although 11.7% of the United States population in 1970 was black, the percentage of blacks among the membership of carpenters' unions in 1972 was only 3.7%. For painters, the percentage was 4.9, and for electricians, 2.6. U. S. Commission on Civil Rights, The Challenge Ahead: Equal Opportunity in Referral Unions 274, 281 (1976). Kaiser's Director of Equal Opportunity Affairs testified that, as a result of discrimination in employment and training opportunity, blacks were underrepresented in skilled crafts "in every industry in the United States, and in every area of the United States." App. 90. While the parties dispute the cause of the relative underrepresentation of blacks in Kaiser's craftwork force, the Court of Appeals indicated that it thought "the general lack of skills among available blacks" was responsible. 563 F. 2d 216, 224 n. 13. There can be little doubt that any lack of skill has its roots in purposeful discrimination of the past, including segregated and inferior trade schools for blacks in Louisiana, U. S. Commission on Civil Rights, 50 States Report 209 (1961); traditionally all-white craft unions in that State, including the electrical workers and the plumbers, *id.,* at 208; union nepotism, *Asbestos Workers* v. *Vogler,* 407 F. 2d 1047 (CA5 1969); and segregated apprenticeship programs, F. Marshall & V. Briggs, The Negro and Apprenticeship 27 (1967).

disturbing for me because, as MR. JUSTICE REHNQUIST points out, the Congress that passed Title VII probably thought it was adopting a principle of nondiscrimination that would apply to blacks and whites alike. While setting aside that principle can be justified where necessary to advance statutory policy by encouraging reasonable responses as a form of voluntary compliance that mitigates "arguable violations," discarding the principle of nondiscrimination where no countervailing statutory policy exists appears to be at odds with the bargain struck when Title VII was enacted.

A closer look at the problem, however, reveals that in each of the principal ways in which the Court's "traditionally segregated job categories" approach expands on the "arguable violations" theory, still other considerations point in favor of the broad standard adopted by the Court, and make it possible for me to conclude that the Court's reading of the statute is an acceptable one.

A. The first point at which the Court departs from the "arguable violations" approach is that it measures an individual employer's capacity for affirmative action solely in terms of a statistical disparity. The individual employer need not have engaged in discriminatory practices in the past. While, under Title VII, a mere disparity may provide the basis for a prima facie case against an employer, *Dothard* v. *Rawlinson,* 433 U. S. 321, 329–331 (1977), it would not conclusively prove a violation of the Act. *Teamsters* v. *United States,* 431 U. S. 324, 339–340, n. 20 (1977); see § 703 (j), 42 U. S. C. § 2000e–2 (j). As a practical matter, however, this difference may not be that great. While the "arguable violation" standard is conceptually satisfying, in practice the emphasis would be on "arguable" rather than on "violation." The great difficulty in the District Court was that no one had any incentive to prove that Kaiser had violated the Act. Neither Kaiser nor the Steelworkers wanted to establish a past violation, nor did Weber. The blacks harmed had never sued and so had no established representative. The Equal Employment Oppor-

tunity Commission declined to intervene, and cannot be expected to intervene in every case of this nature. To make the "arguable violation" standard work, it would have to be set low enough to permit the employer to prove it without obligating himself to pay a damages award. The inevitable tendency would be to avoid hairsplitting litigation by simply concluding that a mere disparity between the racial composition of the employer's work force and the composition of the qualified local labor force would be an "arguable violation," even though actual liability could not be established on that basis alone. See Note, 57 N. C. L. Rev. 695, 714–719 (1979).

B. The Court also departs from the "arguable violation" approach by permitting an employer to redress discrimination that lies wholly outside the bounds of Title VII. For example, Title VII provides no remedy for pre-Act discrimination, *Hazelwood School District* v. *United States,* 433 U. S. 299, 309–310 (1977); yet the purposeful discrimination that creates a "traditionally segregated job category" may have entirely predated the Act. More subtly, in assessing a prima facie case of Title VII liability, the composition of the employer's work force is compared to the composition of the pool of workers who meet valid job qualifications. *Hazelwood,* 433 U. S., at 308 and n. 13; *Teamsters* v. *United States,* 431 U. S., at 339–340, and n. 20. When a "job category" is traditionally segregated, however, that pool will reflect the effects of segregation, and the Court's approach goes further and permits a comparison with the composition of the labor force as a whole, in which minorities are more heavily represented.

Strong considerations of equity support an interpretation of Title VII that would permit private affirmative action to reach where Title VII itself does not. The bargain struck in 1964 with the passage of Title VII guaranteed equal opportunity for white and black alike, but where Title VII provides no remedy for blacks, it should not be construed to foreclose private affirmative action from supplying relief. It seems unfair for respondent Weber to argue, as he does, that the

asserted scarcity of black craftsmen in Louisiana, the product of historic discrimination, makes Kaiser's training program illegal because it ostensibly absolves Kaiser of all Title VII liability. Brief for Respondents 60. Absent compelling evidence of legislative intent, I would not interpret Title VII itself as a means of "locking in" the effects of segregation for which Title VII provides no remedy. Such a construction, as the Court points out, *ante,* at 204, would be "ironic," given the broad remedial purposes of Title VII.

MR. JUSTICE REHNQUIST's dissent, while it focuses more on what Title VII does not require than on what Title VII forbids, cites several passages that appear to express an intent to "lock in" minorities. In mining the legislative history anew, however, the dissent, in my view, fails to take proper account of our prior cases that have given that history a much more limited reading than that adopted by the dissent. For example, in *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 434–436, and n. 11 (1971), the Court refused to give controlling weight to the memorandum of Senators Clark and Case which the dissent now finds so persuasive. See *post,* at 239–241. And in quoting a statement from that memorandum that an employer would not be "permitted . . . to prefer Negroes for future vacancies," *post,* at 240, the dissent does not point out that the Court's opinion in *Teamsters* v. *United States,* 431 U. S., at 349–351, implies that that language is limited to the protection of established seniority systems. Here, seniority is not in issue because the craft training program is new and does not involve an abrogation of pre-existing seniority rights. In short, the passages marshaled by the dissent are not so compelling as to merit the whip hand over the obvious equity of permitting employers to ameliorate the effects of past discrimination for which Title VII provides no direct relief.

## III

I also think it significant that, while the Court's opinion does not foreclose other forms of affirmative action, the Kaiser

program it approves is a moderate one. The opinion notes that the program does not afford an absolute preference for blacks, and that it ends when the racial composition of Kaiser's craftwork force matches the racial composition of the local population. It thus operates as a temporary tool for remedying past discrimination without attempting to "maintain" a previously achieved balance. See *University of California Regents* v. *Bakke,* 438 U. S. 265, 342 n. 17 (1978) (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.). Because the duration of the program is finite, it perhaps will end even before the "stage of maturity when action along this line is no longer necessary." *Id.,* at 403 (opinion of BLACKMUN, J.). And if the Court has misperceived the political will, it has the assurance that because the question is statutory Congress may set a different course if it so chooses.

MR. CHIEF JUSTICE BURGER, dissenting.

The Court reaches a result I would be inclined to vote for were I a Member of Congress considering a proposed amendment of Title VII. I cannot join the Court's judgment, however, because it is contrary to the explicit language of the statute and arrived at by means wholly incompatible with long-established principles of separation of powers. Under the guise of statutory "construction," the Court effectively rewrites Title VII to achieve what it regards as a desirable result. It "amends" the statute to do precisely what both its sponsors and its opponents agreed the statute was *not* intended to do.

When Congress enacted Title VII after long study and searching debate, it produced a statute of extraordinary clarity, which speaks directly to the issue we consider in this case. In § 703 (d) Congress provided:

> "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or

retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training." 42 U. S. C. § 2000e–2 (d).

Often we have difficulty interpreting statutes either because of imprecise drafting or because legislative compromises have produced genuine ambiguities. But here there is no lack of clarity, no ambiguity. The quota embodied in the collective-bargaining agreement between Kaiser and the Steelworkers unquestionably discriminates on the basis of race against individual employees seeking admission to on-the-job training programs. And, under the plain language of § 703 (d), that is "an *unlawful* employment practice."

Oddly, the Court seizes upon the very clarity of the statute almost as a justification for evading the unavoidable impact of its language. The Court blandly tells us that Congress could not really have meant what it said, for a "literal construction" would defeat the "purpose" of the statute—at least the congressional "purpose" as five Justices divine it today. But how are judges supposed to ascertain the *purpose* of a statute except through the words Congress used and the legislative history of the statute's evolution? One need not even resort to the legislative history to recognize what is apparent from the face of Title VII—that it is specious to suggest that § 703 (j) contains a negative pregnant that permits employers to do what §§ 703 (a) and (d) unambiguously and unequivocally *forbid* employers from doing. Moreover, as MR. JUSTICE REHNQUIST's opinion—which I join—conclusively demonstrates, the legislative history makes equally clear that the supporters and opponents of Title VII reached an agreement about the statute's intended effect. That agreement, expressed so clearly in the language of the statute that no one should doubt its meaning, forecloses the reading which the Court gives the statute today.

Arguably, Congress may not have gone far enough in correcting the effects of past discrimination when it enacted Title VII. The gross discrimination against minorities to which the Court adverts—particularly against Negroes in the building trades and craft unions—is one of the dark chapters in the otherwise great history of the American labor movement. And, I do not question the importance of encouraging voluntary compliance with the purposes and policies of Title VII. But that statute was conceived and enacted to make discrimination against *any* individual illegal, and I fail to see how "voluntary compliance" with the no-discrimination principle that is the heart and soul of Title VII as currently written will be achieved by permitting employers to discriminate against some individuals to give preferential treatment to others.

Until today, I had thought the Court was of the unanimous view that "[d]iscriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed" in Title VII. *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 431 (1971). Had Congress intended otherwise, it very easily could have drafted language allowing what the Court permits today. Far from doing so, Congress expressly *prohibited* in §§ 703 (a) and (d) the very discrimination against Brian Weber which the Court today approves. If "affirmative action" programs such as the one presented in this case are to be permitted, it is for Congress, not this Court, to so direct.

It is often observed that hard cases make bad law. I suspect there is some truth to that adage, for the "hard" cases always tempt judges to exceed the limits of their authority, as the Court does today by totally rewriting a crucial part of Title VII to reach a "desirable" result. Cardozo no doubt had this type of case in mind when he wrote:

> "The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of

beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to 'the primordial necessity of order in the social life.' Wide enough in all conscience is the field of discretion that remains." The Nature of the Judicial Process 141 (1921).

What Cardozo tells us is beware the "good result," achieved by judicially unauthorized or intellectually dishonest means on the appealing notion that the desirable ends justify the improper judicial means. For there is always the danger that the seeds of precedent sown by good men for the best of motives will yield a rich harvest of unprincipled acts of others also aiming at "good ends."

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

In a very real sense, the Court's opinion is ahead of its time: it could more appropriately have been handed down five years from now, in 1984, a year coinciding with the title of a book from which the Court's opinion borrows, perhaps subconsciously, at least one idea. Orwell describes in his book a governmental official of Oceania, one of the three great world powers, denouncing the current enemy, Eurasia, to an assembled crowd:

"It was almost impossible to listen to him without being first convinced and then maddened. . . . The speech had been proceeding for perhaps twenty minutes when a messenger hurried onto the platform and a scrap of paper was slipped into the speaker's hand. He unrolled and read it without pausing in his speech. Nothing altered in his voice or manner, or in the content of what he was saying, but suddenly the names were different. Without words

said, a wave of understanding rippled through the crowd. Oceania was at war with Eastasia! . . . The banners and posters with which the square was decorated were all wrong! . . .

"[T]he speaker had switched from one line to the other actually in mid-sentence, not only without a pause, but without even breaking the syntax." G. Orwell, Nineteen Eighty-Four 181–182 (1949).

Today's decision represents an equally dramatic and equally unremarked switch in this Court's interpretation of Title VII.

The operative sections of Title VII prohibit racial discrimination in employment *simpliciter*. Taken in its normal meaning, and as understood by all Members of Congress who spoke to the issue during the legislative debates, see *infra,* at 231–251, this language prohibits a covered employer from considering race when making an employment decision, whether the race be black or white. Several years ago, however, a United States District Court held that "the dismissal of white employees charged with misappropriating company property while not dismissing a similarly charged Negro employee does not raise a claim upon which Title VII relief may be granted." *McDonald* v. *Santa Fe Trail Transp. Co.,* 427 U. S. 273, 278 (1976). This Court unanimously reversed, concluding from the "uncontradicted legislative history" that "Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes . . . ." *Id.,* at 280.

We have never wavered in our understanding that Title VII "prohibits *all* racial discrimination in employment, without exception for any group of particular employees." *Id.,* at 283 (emphasis in original). In *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 431 (1971), our first occasion to interpret Title VII, a unanimous Court observed that "[d]iscriminatory preference, for any group, minority or majority, is precisely and only what Congress has proscribed." And in our most

recent discussion of the issue, we uttered words seemingly dispositive of this case: "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 579 (1978) (emphasis in original).[1]

Today, however, the Court behaves much like the Orwellian speaker earlier described, as if it had been handed a note indicating that Title VII would lead to a result unacceptable to the Court if interpreted here as it was in our prior decisions. Accordingly, without even a break in syntax, the Court rejects "a literal construction of § 703 (a)" in favor of newly discovered "legislative history," which leads it to a conclusion directly contrary to that compelled by the "uncontradicted legislative history" unearthed in *McDonald* and our other prior decisions. Now we are told that the legislative history of Title VII shows that employers are free to discriminate on the basis of race: an employer may, in the Court's words, "trammel the interests of the white employees" in favor of black employees in order to eliminate "racial imbalance." *Ante,* at 208. Our earlier interpretations of Title VII, like the banners and posters decorating the square in Oceania, were all wrong.

As if this were not enough to make a reasonable observer question this Court's adherence to the oft-stated principle that our duty is to construe rather than rewrite legislation, *United States* v. *Rutherford,* 442 U. S. 544, 555 (1979), the Court also seizes upon § 703 (j) of Title VII as an independent, or at least partially independent, basis for its holding. Totally ignoring the wording of that section, which is obviously addressed to those charged with the responsibility of inter-

---

[1] Our statements in *Griggs* and *Furnco Construction,* patently inconsistent with today's holding, are not even mentioned, much less distinguished, by the Court.

preting the law rather than those who are subject to its proscriptions, and totally ignoring the months of legislative debates preceding the section's introduction and passage, which demonstrate clearly that it was enacted to prevent precisely what occurred in this case, the Court infers from § 703 (j) that "Congress chose not to forbid all voluntary race-conscious affirmative action." *Ante,* at 206.

Thus, by a *tour de force* reminiscent not of jurists such as Hale, Holmes, and Hughes, but of escape artists such as Houdini, the Court eludes clear statutory language, "uncontradicted" legislative history, and uniform precedent in concluding that employers are, after all, permitted to consider race in making employment decisions. It may be that one or more of the principal sponsors of Title VII would have preferred to see a provision allowing preferential treatment of minorities written into the bill. Such a provision, however, would have to have been expressly or impliedly excepted from Title VII's explicit prohibition on all racial discrimination in employment. There is no such exception in the Act. And a reading of the legislative debates concerning Title VII, in which proponents and opponents alike uniformly denounced discrimination in favor of, as well as discrimination against, Negroes, demonstrates clearly that any legislator harboring an unspoken desire for such a provision could not possibly have succeeded in enacting it into law.

I

Kaiser opened its Gramercy, La., plant in 1958. Because the Gramercy facility had no apprenticeship or in-plant craft training program, Kaiser hired as craftworkers only persons with prior craft experience. Despite Kaiser's efforts to locate and hire trained black craftsmen, few were available in the Gramercy area, and as a consequence, Kaiser's craft positions were manned almost exclusively by whites. In February 1974, under pressure from the Office of Federal Contract Compliance to increase minority representation in craft positions

at its various plants,[2] and hoping to deter the filing of employment discrimination claims by minorities, Kaiser entered into a collective-bargaining agreement with the United Steelworkers of America (Steelworkers) which created a new on-the-job craft training program at 15 Kaiser facilities, including the Gramercy plant. The agreement required that no less than one minority applicant be admitted to the training program for every nonminority applicant until the percentage of blacks in craft positions equaled the percentage of blacks in the local work force.[3] Eligibility for the craft training pro-

---

[2] The Office of Federal Contract Compliance (OFCC), subsequently renamed the Office of Federal Contract Compliance Programs (OFCCP), is an arm of the Department of Labor responsible for ensuring compliance by Government contractors with the equal employment opportunity requirements established by Exec. Order No. 11246, 3 CFR 339 (1964–1965 Comp.), as amended by Exec. Order No. 11375, 3 CFR 684 (1966–1970 Comp.), and by Exec. Order No. 12086, 3 CFR 230 (1979).

Executive Order No. 11246, as amended, requires all applicants for federal contracts to refrain from employment discrimination and to "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin." § 202 (1), 3 CFR 685 (1966–1970 Comp.), note following 42 U. S. C. § 2000e. The Executive Order empowers the Secretary of Labor to issue rules and regulations necessary and appropriate to achieve its purpose. He, in turn, has delegated most enforcement duties to the OFCC. See 41 CFR § 60–20.1 *et seq.*, § 60–2.24 (1978).

The affirmative action program mandated by 41 CFR § 60–2 (Revised Order No. 4) for nonconstruction contractors requires a "utilization" study to determine minority representation in the work force. Goals for hiring and promotion must be set to overcome any "underutilization" found to exist.

The OFCC employs the "power of the purse" to coerce acceptance of its affirmative action plans. Indeed, in this action, "the district court found that the 1974 collective bargaining agreement reflected less of a desire on Kaiser's part to train black craft workers than a self-interest in satisfying the OFCC in order to retain lucrative government contracts." 563 F. 2d 216, 226 (CA5 1977).

[3] The pertinent portions of the collective-bargaining agreement provide: "It is further agreed that the Joint Committee will specifically review the minority representation in the existing Trade, Craft and Assigned Main-

grams was to be determined on the basis of plant seniority, with black and white applicants to be selected on the basis of their relative seniority within their racial group.

Brian Weber is white. He was hired at Kaiser's Gramercy plant in 1968. In April 1974, Kaiser announced that it was offering a total of nine positions in three on-the-job training programs for skilled craft jobs. Weber applied for all three programs, but was not selected. The successful candidates—five black and four white applicants—were chosen in accord-

---

tenance classifications, in the plants set forth below, and, where necessary, establish certain goals and time tables in order to achieve a desired minority ratio:

"[Gramercy Works listed, among others]

"As apprentice and craft jobs are to be filled, the contractual selection criteria shall be applied in reaching such goals; at a minimum, not less than one minority employee will enter for every non-minority employee entering until the goal is reached unless at a particular time there are insufficient available qualified minority candidates. . . .

⋅ ⋅ ⋅ ⋅ ⋅

"The term 'minority' as used herein shall be as defined in EEOC Reporting Requirements." 415 F. Supp. 761, 763 (ED La. 1976).

The "Joint Committee" subsequently entered into a "Memorandum of Understanding" establishing a goal of 39% as the percentage of blacks that must be represented in each "craft family" at Kaiser's Gramercy plant. Id., at 764. The goal of 39% minority representation was based on the percentage of minority workers available in the Gramercy area.

Contrary to the Court's assertion, it is not at all clear that Kaiser's admission quota is a "temporary measure . . . not intended to maintain racial balance." Ante, at 208. Dennis E. English, industrial relations superintendent at the Gramercy plant, testified at trial:

"Once the goal is reached of 39 percent, or whatever the figure will be down the road, I think it's subject to change, once the goal is reached in each of the craft families, at that time, we will then revert to a ratio of what that percentage is, if it remains at 39 percent and we attain 39 percent someday, we will then continue placing trainees in the program at that percentage. The idea, again, being to have a minority representation in the plant that is equal to that representation in the community work force population." App. 69.

ance with the 50% minority admission quota mandated under the 1974 collective-bargaining agreement. Two of the successful black applicants had less seniority than Weber.[4] Weber brought the instant class action [5] in the United States District Court for the Eastern District of Louisiana, alleging that use of the 50% minority admission quota to fill vacancies in Kaiser's craft training programs violated Title VII's prohibition on racial discrimination in employment. The District Court and the Court of Appeals for the Fifth Circuit agreed, enjoining further use of race as a criterion in admitting applicants to the craft training programs.[6]

---

[4] In addition to the April programs, the company offered three more training programs in 1974 with a total of four positions available. Two white and two black employees were selected for the programs, which were for "Air Conditioning Repairman" (one position), "Carpenter-Painter" (two positions), and "Insulator" (one position). Weber sought to bid for the insulator trainee position, but he was not selected because that job was reserved for the most senior qualified black employee. *Id.*, at 46.

[5] The class was defined to include the following employees:

"All persons employed by Kaiser Aluminum & Chemical Corporation at its Gramercy, Louisiana, works who are members of the United Steelworkers of America, AFL–CIO Local 5702, who are not members of a minority group, and who have applied for or were eligible to apply for on-the-job training programs since February 1, 1974." 415 F. Supp., at 763.

[6] In upholding the District Court's injunction, the Court of Appeals affirmed the District Court's finding that Kaiser had not been guilty of any past discriminatory hiring or promotion at its Gramercy plant. The court thus concluded that this finding removed the instant action from this Court's line of "remedy" decisions authorizing fictional seniority in order to place proved victims of discrimination in as good a position as they would have enjoyed absent the discriminatory hiring practices. See *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747 (1976). "In the absence of prior discrimination," the Court of Appeals observed, "a racial quota loses its character as an equitable *remedy* and must be banned as an unlawful racial *preference* prohibited by Title VII, §§ 703 (a) and (d). Title VII outlaws preferences for any group, minority or majority, if based on race or other impermissible classifications, but it does not outlaw preferences favoring victims of discrimination." 563 F. 2d, at 224 (em-

226

II

Were Congress to act today specifically to prohibit the type of racial discrimination suffered by Weber, it would be hard pressed to draft language better tailored to the task than that found in § 703 (d) of Title VII:

> "It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training." 78 Stat. 256, 42 U. S. C. § 2000e-2 (d).

phasis in original). Nor was the Court of Appeals moved by the claim that Kaiser's discriminatory admission quota is justified to correct a lack of training of Negroes due to past societal discrimination: "Whatever other effects societal discrimination may have, it has had—by the specific finding of the court below—*no effect* on the seniority of any party here." *Id.,* at 226 (emphasis in original). Finally, the Court of Appeals rejected the argument that Kaiser's admission quota does not violate Title VII because it is sanctioned, indeed compelled, by Exec. Order No. 11246 and regulations issued by the OFCC mandating affirmative action by all Government contractors. See n. 2, *supra.* Citing *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952), the court concluded that "[i]f Executive Order 11246 mandates a racial quota for admission to on-the-job training by Kaiser, *in the absence of any prior hiring or promotion discrimination,* the Executive Order must fall before this direct congressional prohibition [of § 703 (d)]." 563 F. 2d, at 227 (emphasis in original).

Judge Wisdom, in dissent, argued that "[i]f an affirmative action plan, adopted in a collective bargaining agreement, is a reasonable remedy for an *arguable* violation of Title VII, it should be upheld." *Id.,* at 230. The United States, in its brief before this Court, and MR. JUSTICE BLACKMUN, *ante,* p. 209, largely adopt Judge Wisdom's theory, which apparently rests on the conclusion that an employer is free to correct *arguable* discrimination against his black employees by adopting measures that he *knows* will discriminate against his white employees.

Equally suited to the task would be § 703 (a) (2), which makes it unlawful for an employer to classify his employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 78 Stat. 255, 42 U. S. C. § 2000e-2 (a) (2).[7]

Entirely consistent with these two express prohibitions is the language of § 703 (j) of Title VII, which provides that the Act is not to be interpreted "to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . of such individual or group" to correct a racial imbalance in the employer's work force. 42 U. S. C. § 2000e-2 (j).[8] Seizing on the word "require," the Court

[7] Section 703 (a) (1) provides the third express prohibition in Title VII of Kaiser's discriminatory admission quota:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 78 Stat. 255, 42 U. S. C. § 2000e-2 (a) (1).

[8] The full text of § 703 (j), 78 Stat. 257, 42 U. S. C. § 2000e-2 (j), provides as follows:

"Nothing contained in this title shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area."

infers that Congress must have intended to "permit" this type of racial discrimination. Not only is this reading of § 703 (j) outlandish in the light of the flat prohibitions of §§ 703 (a) and (d), but, as explained in Part III, it is also totally belied by the Act's legislative history.

Quite simply, Kaiser's racially discriminatory admission quota is flatly prohibited by the plain language of Title VII. This normally dispositive fact,[9] however, gives the Court only momentary pause. An "interpretation" of the statute upholding Weber's claim would, according to the Court, " 'bring about an end completely at variance with the purpose of the statute.' " *Ante,* at 202, quoting *United States* v. *Public Utilities Comm'n,* 345 U. S. 295, 315 (1953). To support this conclusion, the Court calls upon the "spirit" of the Act, which it divines from passages in Title VII's legislative history indicating that enactment of the statute was prompted by Congress' desire " 'to open employment opportunities for Negroes in occupations which [had] been traditionally closed to them.' " *Ante,* at 203, quoting 110 Cong. Rec. 6548 (1964) (remarks of Sen. Humphrey).[10] But the legislative history invoked by

[9] "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning.

". . . [W]hen words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn . . . from any extraneous source." *Caminetti* v. *United States,* 242 U. S. 470, 490 (1917).

[10] In holding that Title VII cannot be interpreted to prohibit use of Kaiser's racially discriminatory admission quota, the Court reasons that it would be "ironic" if a law inspired by the history of racial discrimination in employment against blacks forbade employers from voluntarily discriminating against whites in favor of blacks. I see no irony in a law that prohibits *all* voluntary racial discrimination, even discrimination directed at whites in favor of blacks. The evil inherent in discrimination against Negroes is that it is based on an immutable characteristic, utterly irrelevant to employment decisions. The characteristic becomes no less

the Court to avoid the plain language of §§ 703 (a) and (d) simply misses the point. To be sure, the reality of employment discrimination against Negroes provided the primary impetus for passage of Title VII. But this fact by no means supports the proposition that Congress intended to leave employers free to discriminate against white persons.[11] In most

immutable and irrelevant, and discrimination based thereon becomes no less evil, simply because the person excluded is a member of one race rather than another. Far from ironic, I find a prohibition on all preferential treatment based on race as elementary and fundamental as the principle that "two wrongs do not make a right."

[11] The only shred of legislative history cited by the Court in support of the proposition that "Congress did not intend wholly to prohibit private and voluntary affirmative action efforts," *ante,* at 203, is the following excerpt from the Judiciary Committee Report accompanying the civil rights bill reported to the House:

"No bill can or should lay claim to eliminating all of the causes and consequences of racial and other types of discrimination against minorities. There is reason to believe, however, that national leadership provided by the enactment of Federal legislation dealing with the most troublesome problems *will create an atmosphere conducive to voluntary or local resolution of other forms of discrimination.*" H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 1, p. 18 (1963) (hereinafter H. R. Rep.), quoted *ante,* at 203–204.

The Court seizes on the italicized language to support its conclusion that Congress did not intend to prohibit voluntary imposition of racially discriminatory employment quotas. The Court, however, stops too short in its reading of the House Report. The words immediately following the material excerpted by the Court are as follows:

"It is, however, possible and necessary for the Congress to enact legislation which prohibits and provides the means of terminating *the most serious types of discrimination.* This H. R. 7152, as amended, would achieve in a number of related areas. It would reduce discriminatory obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right. It would make it possible to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public. It would guarantee that there will be no discrimination upon recipients of Federal financial assistance. It would prohibit discrimination in employment, and

cases, "[l]egislative history . . . is more vague than the statute we are called upon to interpret." *United States* v. *Public Utilities Comm'n, supra,* at 320 (Jackson, J., concurring). Here, however, the legislative history of Title VII is as clear as the language of §§ 703 (a) and (d), and it irrefutably demonstrates that Congress meant precisely what it said in §§ 703 (a) and (d)—that *no* racial discrimination in employment is permissible under Title VII, not even preferential treatment of minorities to correct racial imbalance.

## III

In undertaking to review the legislative history of Title VII, I am mindful that the topic hardly makes for light reading,

---

provide means to expedite termination of discrimination in public education. It would open additional avenues to deal with redress of denials of equal protection of the laws on account of race, color, religion, or national origin by State or local authorities." H. R. Rep., pt. 1, p. 18 (emphasis added).

When thus read in context, the meaning of the italicized language in the Court's excerpt of the House Report becomes clear. By dealing with "the most serious types of discrimination," such as discrimination in voting, public accommodations, employment, etc., H. R. 7152 would hopefully inspire "voluntary or local resolution of other forms of discrimination," that is, forms other than discrimination in voting, public accommodations, employment, etc.

One can also infer from the House Report that the Judiciary Committee hoped that federal legislation would inspire voluntary elimination of discrimination against minority groups other than those protected under the bill, perhaps the aged and handicapped to name just two. In any event, the House Report does not support the Court's proposition that Congress, by banning racial discrimination in employment, intended to permit racial discrimination in employment.

Thus, examination of the House Judiciary Committee's report reveals that the Court's interpretation of Title VII, far from being compelled by the Act's legislative history, is utterly without support in that legislative history. Indeed, as demonstrated in Part III, *infra,* the Court's interpretation of Title VII is totally refuted by the Act's legislative history.

but I am also fearful that nothing short of a thorough examination of the congressional debates will fully expose the magnitude of the Court's misinterpretation of Congress' intent.

A

Introduced on the floor of the House of Representatives on June 20, 1963, the bill—H. R. 7152—that ultimately became the Civil Rights Act of 1964 contained no compulsory provisions directed at private discrimination in employment. The bill was promptly referred to the Committee on the Judiciary, where it was amended to include Title VII. With two exceptions, the bill reported by the House Judiciary Committee contained §§ 703 (a) and (d) as they were ultimately enacted. Amendments subsequently adopted on the House floor added § 703's prohibition against sex discrimination and § 703 (d)'s coverage of "on-the-job training."

After noting that "[t]he purpose of [Title VII] is to eliminate . . . discrimination in employment based on race, color, religion, or national origin," the Judiciary Committee's Report simply paraphrased the provisions of Title VII without elaboration. H. R. Rep., pt. 1, p. 26. In a separate Minority Report, however, opponents of the measure on the Committee advanced a line of attack which was reiterated throughout the debates in both the House and Senate and which ultimately led to passage of § 703 (j). Noting that the word "discrimination" was nowhere defined in H. R. 7152, the Minority Report charged that the absence from Title VII of any reference to "racial imbalance" was a "public relations" ruse and that "the administration intends to rely upon its own construction of 'discrimination' as including the lack of racial balance . . . ." H. R. Rep., pt. 1, pp. 67–68. To demonstrate how the bill would operate in practice, the Minority Report posited a number of hypothetical employment situations, concluding in each example that the employer *"may be forced to hire according to race,* to 'racially balance' those who work for

him *in every job classification* or be in violation of Federal law." *Id.*, at 69 (emphasis in original).[12]

When H. R. 7152 reached the House floor, the opening speech in support of its passage was delivered by Representative Celler, Chairman of the House Judiciary Committee and the Congressman responsible for introducing the legislation. A portion of that speech responded to criticism "seriously mis-

---

[12] One example has particular relevance to the instant litigation:

"Under the power granted in this bill, if a carpenters' hiring hall, say, had 20 men awaiting call, the first 10 in seniority being white carpenters, the union could be forced to pass them over in favor of carpenters beneath them in seniority but of the stipulated race. And if the union roster did not contain the names of the carpenters of the race needed to 'racially balance' the job, the union agent must, then, go into the street and recruit members of the stipulated race in sufficient number to comply with Federal orders, else his local could be held in violation of Federal law." H. R. Rep., pt. 1, p. 71.

From this and other examples, the Minority Report concluded: "That this is, in fact, a not too subtle system of racism-in-reverse cannot be successfully denied." *Id.*, at 73.

Obviously responding to the Minority Report's charge that federal agencies, particularly the Equal Employment Opportunity Commission would equate "discrimination" with "racial imbalance," the Republican sponsors of the bill on the Judiciary Committee stated in a separate Report:

"It must also be stressed that the Commission must confine its activities to correcting abuse, not promoting equality with mathematical certainty. In this regard, nothing in the title permits a person to demand employment. . . . Internal affairs of employers and labor organizations must not be interfered· with except to the limited extent that correction is required in discrimination practices. Its primary task is to make certain that the channels of employment are open to persons regardless of their race and that jobs in companies or membership in unions are strictly filled on the basis of qualification." *Id.*, pt. 2, p. 29.

The Republican supporters of the bill concluded their remarks on Title VII by declaring that "[a]ll vestiges of inequality based solely on race must be removed . . . ." *Id.*, at 30.

represent[ing] what the bill would do and grossly distort[ing] its effects":

> "[T]he charge has been made that the Equal Employment Opportunity Commission to be established by title VII of the bill would have the power to prevent a business from employing and promoting the people it wished, and that a 'Federal inspector' could then order the hiring and promotion only of employees of certain races or religious groups. This description of the bill is entirely wrong. . . .

> . . . . .

> "Even [a] court could not order that any preference be given to any particular race, religion or other group, but would be limited to ordering an end of discrimination. The statement that a Federal inspector could order the employment and promotion only of members of a specific racial or religious group is therefore patently erroneous.

> . . . . .

> ". . . The Bill would do no more than prevent . . . employers from discriminating against *or in favor* of workers because of their race, religion, or national origin.

> "It is likewise not true that the Equal Employment Opportunity Commission would have power to rectify existing 'racial or religious imbalance' in employment by requiring the hiring of certain people without regard to their qualifications simply because they are of a given race or religion. Only actual discrimination could be stopped." 110 Cong. Rec. 1518 (1964) (emphasis added).

Representative Celler's construction of Title VII was repeated by several other supporters during the House debate.[13]

---

[13] Representative Lindsay had this to say:

"This legislation . . . does not, as has been suggested heretofore both on and off the floor, force acceptance of people in . . . jobs . . . because they are Negro. It does not impose quotas or any special privileges of seniority

234

Thus, the battle lines were drawn early in the legislative struggle over Title VII, with opponents of the measure charging that agencies of the Federal Government such as the Equal Employment Opportunity Commission (EEOC), by interpreting the word "discrimination" to mean the existence of "racial imbalance," would "require" employers to grant preferential treatment to minorities, and supporters responding that the EEOC would be granted no such power and that, indeed, Title VII prohibits discrimination "in favor of workers because of their race." Supporters of H. R. 7152 in the House ultimately prevailed by a vote of 290 to 130,[14] and the measure was sent to the Senate to begin what became the longest debate in that body's history.

---

or acceptance. There is nothing whatever in this bill about racial balance as appears so frequently in the minority report of the Committee.

"What the bill does do is prohibit discrimination because of race . . . ." 110 Cong. Rec. 1540 (1964).

Representative Minish added: "Under title VII, employment will be on the basis of merit, not of race. This means that no quota system will be set up, no one will be forced to hire incompetent help because of race or religion, and no one will be given a vested right to demand employment for a certain job." *Id.,* at 1600. Representative Goodell, answering the charge that Title VII would be interpreted "to requir[e] a racial balance," *id.,* at 2557, responded: "There is nothing here as a matter of legislative history that would require racial balancing. . . . We are not talking about a union having to balance its membership or an employer having to balance the number of employees. There is no quota involved. It is a matter of an individual's rights having been violated, charges having been brought, investigation carried out and conciliation having been attempted and then proof in court that there was discrimination and denial of rights on the basis of race or color." *Id.,* at 2558. After H. R. 7152 had been passed and sent to the Senate, Republican supporters of the bill in the House prepared an interpretative memorandum making clear that "title VII *does not permit* the ordering of racial quotas in businesses or unions and does not permit interferences with seniority rights of employees or union members." *Id.,* at 6566 (emphasis added).

[14] Eleven Members did not vote.

## B

The Senate debate was broken into three phases: the debate on sending the bill to Committee, the general debate on the bill prior to invocation of cloture, and the debate following cloture.

### 1

When debate on the motion to refer the bill to Committee opened, opponents of Title VII in the Senate immediately echoed the fears expressed by their counterparts in the House, as is demonstrated by the following colloquy between Senators Hill and Ervin:

> "Mr. ERVIN. I invite attention to . . . Section [703 (a)] . . . .
>
> . . . . .
>
> "I ask the Senator from Alabama if the Commission could not tell an employer that he had too few employees, that he had limited his employment, and enter an order, under [Section 703 (a)], requiring him to hire more persons, not because the employer thought he needed more persons, but because the Commission wanted to compel him to employ persons of a particular race.
>
> "Mr. HILL. The Senator is correct. That power is written into the bill. The employer could be forced to hire additional persons . . . ." 110 Cong. Rec. 4764 (1964).[15]

---

[15] Continuing with their exchange, Senators Hill and Ervin broached the subject of racial balance:

"Mr. ERVIN. So if the Commissioner . . . should be joined by another member of the Commission in the finding that the employer had too high a percentage, in the Commission's judgment, of persons of the Caucasian race working in his business, they could make the employer either hire, in addition to his present employees, an extra number of Negro employees, or compel him to fire employees of the Caucasian race in order to make a place for Negro employees?

"Mr. HILL. The Senator is correct, although the employer might not

236

Senator Humphrey, perhaps the primary moving force behind H. R. 7152 in the Senate, was the first to state the proponents' understanding of Title VII. Responding to a political advertisement charging that federal agencies were at liberty to interpret the word "discrimination" in Title VII to require racial balance, Senator Humphrey stated: "[T]he meaning of racial or religious discrimination is perfectly clear. . . . [I]t means a distinction in treatment given to different individuals because of their different race, religion, or national origin." *Id.*, at 5423.[16] Stressing that Title VII "does not limit the employer's freedom to hire, fire, promote or demote for any reasons—or no reasons—so long as his action is not

---

need the additional employees, and although they might bring his business into bankruptcy." 110 Cong. Rec. 4764 (1964).

This view was reiterated by Senator Robertson:

"It is contemplated by this title that the percentage of colored and white population in a community shall be in similar percentages in every business establishment that employs over 25 persons. Thus, if there were 10,000 colored persons in a city and 15,000 whites, an employer with 25 employees would, in order to overcome racial imbalance, be required to have 10 colored personnel and 15 white. And if by chance that employer had 20 colored employees, he would have to fire 10 of them in order to rectify the situation. Of course, this works the other way around where whites would be fired." *Id.*, at 5092.

Senator Humphrey interrupted Senator Robertson's discussion, responding: "The bill does not require that at all. If it did, I would vote against it. . . . There is no percentage quota." *Ibid.*

[16] This view was reiterated two days later in the "Bipartisan Civil Rights Newsletter" distributed to the Senate on March 19 by supporters of H. R. 7152:

"3. Defining discrimination: Critics of the civil rights bill have charged that the word 'discrimination' is left undefined in the bill and therefore the door is open for interpretation of this term according to 'whim or caprice.' . . .

. . . . .

"There is no sound basis for uncertainty about the meaning of discrimination in the context of the civil rights bill. It means a distinction in treatment given to different individuals because of their different race, religion, or national origin." *Id.*, at 7477.

based on race," Senator Humphrey further stated that "nothing in the bill would permit any official or court to require any employer or labor union to give preferential treatment to any minority group." *Ibid.*[17]

After 17 days of debate, the Senate voted to take up the bill directly, without referring it to a committee. *Id.*, at 6455. Consequently, there is no Committee Report in the Senate.

2

Formal debate on the merits of H. R. 7152 began on March 30, 1964. Supporters of the bill in the Senate had made elaborate preparations for this second round. Senator Humphrey, the majority whip, and Senator Kuchel, the minority whip, were selected as the bipartisan floor managers on the entire civil rights bill. Responsibility for explaining and defending each important title of the bill was placed on bipartisan "captains." Senators Clark and Case were selected as the bipartisan captains responsible for Title VII. Vaas, Title VII: Legislative History, 7 B. C. Ind. & Com. L. Rev. 431, 444–445 (1966) (hereinafter Title VII: Legislative History).

In the opening speech of the formal Senate debate on the bill, Senator Humphrey addressed the main concern of Title

---

[17] Earlier in the debate, Senator Humphrey had introduced a newspaper article quoting the answers of a Justice Department "expert" to the "10 most commonly expressed objections to [Title VII]." Insofar as is pertinent here, the article stated:

"Objection: The law would empower Federal 'inspectors' to require employers to hire by race. White people would be fired to make room for Negroes. Seniority rights would be destroyed. . . .

"Reply: The bill requires no such thing. The five-member Equal Employment Opportunity Commission that would be created would have no powers to order anything. . . .

". . . The bill would not authorize anyone to order hiring or firing to achieve racial or religious balance. An employer will remain wholly free to hire on the basis of his needs and of the job candidate's qualifications. What is prohibited is the refusal to hire someone because of his race or religion. Similarly, the law will have no effect on union seniority rights." *Id.*, at 5094.

238

VII's opponents, advising that not only does Title VII not require use of racial quotas, *it does not permit* their use. "The truth," stated the floor leader of the bill, "is that this title forbids discriminating against anyone on account of race. This is the simple and complete truth about title VII." 110 Cong. Rec. 6549 (1964). Senator Humphrey continued:

> "Contrary to the allegations of some opponents of this title, there is nothing in it that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial 'quota' or to achieve a certain racial balance.
>
> "That bugaboo has been brought up a dozen times; but it is nonexistent. In fact, *the very opposite is true. Title VII prohibits discrimination.* In effect, it says that race, religion and national origin are not to be used as the basis for hiring and firing. Title VII is designed to encourage hiring on the basis of ability and qualifications, not race or religion." *Ibid.* (emphasis added).

At the close of his speech, Senator Humphrey returned briefly to the subject of employment quotas: "It is claimed that the bill would require racial quotas for all hiring, when in fact it provides that race shall not be a basis for making personnel decisions." *Id.,* at 6553.

Senator Kuchel delivered the second major speech in support of H. R. 7152. In addressing the concerns of the opposition, he observed that "[n]othing could be further from the truth" than the charge that "Federal inspectors" would be empowered under Title VII to dictate racial balance and preferential advancement of minorities. *Id.,* at 6563. Senator Kuchel emphasized that seniority rights would in no way be affected by Title VII: "Employers and labor organizations could not discriminate *in favor of or against* a person because of his race, his religion, or his national origin. In such matters . . . the bill now before us . . . is color-blind." *Id.,* at 6564 (emphasis added).

A few days later the Senate's attention focused exclusively on Title VII, as Senators Clark and Case rose to discuss the title of H. R. 7152 on which they shared floor "captain" responsibilities. In an interpretative memorandum submitted jointly to the Senate, Senators Clark and Case took pains to refute the opposition's charge that Title VII would result in preferential treatment of minorities. Their words were clear and unequivocal:

> "There is no requirement in title VII that an employer maintain a racial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance, whatever such a balance may be, would involve a violation of title VII because maintaining such a balance would require an employer to hire or to refuse to hire on the basis of race. It must be emphasized that discrimination is prohibited as to any individual." *Id.,* at 7213.[18]

---

[18] In obvious reference to the charge that the word "discrimination" in Title VII would be interpreted by federal agencies to mean the absence of racial balance, the interpretative memorandum stated:

"[Section 703] prohibits discrimination in employment because of race, color, religion, sex, or national origin. It has been suggested that the concept of discrimination is vague. In fact it is clear and simple and has no hidden meanings. To discriminate is to make a distinction, to make a difference in treatment *or favor,* and those distinctions or differences in treatment *or favor* which are prohibited by [Section 703] are those which are based on any five of the forbidden criteria: race, color, religion, sex, and national origin." *Id.,* at 7213 (emphasis added).

Earlier in his speech, Senator Clark introduced a memorandum prepared at his request by the Justice Department with the purpose of responding to criticisms of Title VII leveled by opponents of the measure, particularly Senator Hill. With regard to racial balance, the Justice Department stated:

"Finally, it has been asserted that title VII would impose a requirement for 'racial balance.' This is incorrect. There is no provision . . . in title VII . . . that requires or authorizes any Federal agency or Federal court to require preferential treatment for any individual or any group for the purpose of achieving racial balance. . . . No employer is required to maintain any ratio of Negroes to whites . . . . On the contrary,

240

Of particular relevance to the instant litigation were their ob-
servations regarding seniority rights. As if directing their
comments at Brian Weber, the Senators said:

"Title VII would have no effect on established seniority
rights. Its effect is prospective and not retrospective.
Thus, for example, if a business has been discriminating
in the past and as a result has an all-white working force,
when the title comes into effect the employer's obligation
would be simply to fill future vacancies on a nondiscrim-
inatory basis. He would not be obliged—*or indeed per-
mitted*—to fire whites in order to hire Negroes, *or to
prefer Negroes for future vacancies, or, once Negroes are
hired, to give them special seniority rights at the expense
of the white workers hired earlier." Ibid.* (emphasis
added).[19]

any deliberate attempt to maintain a given balance would almost cer-
tainly run afoul of title VII because it would involve a failure or refusal
to hire some individual because of his race, color, religion, sex, or national
origin. What title VII seeks to accomplish, what the civil rights bill
seeks to accomplish is equal treatment for all." *Id.*, at 7207.

[19] A Justice Department memorandum earlier introduced by Senator
Clark, see n. 18, *supra,* expressed the same view regarding Title VII's
impact on seniority rights of employees:

"Title VII would have no effect on seniority rights existing at the time it
takes effect. . . . This would be true even in the case where owing to
discrimination prior to the effective date of the title, white workers had
more seniority than Negroes. . . . [A]ssuming that seniority rights were
built up over a period of time during which Negroes were not hired, these
rights would not be set aside by the taking effect of title VII. Employers
and labor organizations would simply be under a duty not to discriminate
against Negroes because of their race." 110 Cong. Rec. 7207 (1964).

The interpretation of Title VII contained in the memoranda introduced
by Senator Clark totally refutes the Court's implied suggestion that
Title VII would prohibit an employer from discriminating on the basis
of race in order to *maintain* a racial balance in his work force, but would
permit him to do so in order to *achieve* racial balance. See *ante,* at 208,
and n. 7.

The maintain-achieve distinction is analytically indefensible in any event.

Thus, with virtual clairvoyance the Senate's leading supporters of Title VII anticipated precisely the circumstances of this case and advised their colleagues that the type of minority preference employed by Kaiser would violate Title VII's ban on racial discrimination. To further accentuate the point, Senator Clark introduced another memorandum dealing with common criticisms of the bill, including the charge that racial quotas would be imposed under Title VII. The answer was simple and to the point: "Quotas are themselves discriminatory." *Id.*, at 7218.

Despite these clear statements from the bill's leading and most knowledgeable proponents, the fears of the opponents

---

Apparently, the Court is saying that an employer is free to *achieve* a racially balanced work force by discriminating against whites, but that once he has reached his goal, he is no longer free to discriminate in order to maintain that racial balance. In other words, once Kaiser reaches its goal of 39% minority representation in craft positions at the Gramercy plant, it can no longer consider race in admitting employees into its on-the-job training programs, even if the programs become as "all-white" as they were in April 1974.

Obviously, the Court is driven to this illogical position by the glaring statement, quoted in text, of Senators Clark and Case that "any deliberate attempt to *maintain* a racial balance . . . would involve a violation of title VII because *maintaining* such a balance would require an employer to hire or to refuse to hire on the basis of race." 110 Cong. Rec. 7213 (1964) (emphasis added). Achieving a certain racial balance, however, no less than maintaining such a balance, would require an employer to hire or to refuse to hire on the basis of race. Further, the Court's own conclusion that Title VII's legislative history, coupled with the wording of § 703 (j), evinces a congressional intent to leave employers free to employ "private, voluntary, race-conscious affirmative action plans," *ante*, at 208, is inconsistent with its maintain-achieve distinction. If Congress' primary purpose in enacting Title VII was to open employment opportunities previously closed to Negroes, it would seem to make little difference whether the employer opening those opportunities was achieving or maintaining a certain racial balance in his work force. Likewise, if § 703 (j) evinces Congress' intent to permit imposition of race-conscious affirmative action plans, it would seem to make little difference whether the plan was adopted to achieve or maintain the desired racial balance.

were not put to rest. Senator Robertson reiterated the view that "discrimination" could be interpreted by a federal "bureaucrat" to require hiring quotas. *Id.,* at 7418–7420.[20] Senators Smathers and Sparkman, while conceding that Title VII does not in so many words require the use of hiring quotas, repeated the opposition's view that employers would be coerced to grant preferential hiring treatment to minorities by agencies of the Federal Government.[21] Senator Williams was quick to respond:

> "Those opposed to H. R. 7152 should realize that to hire a Negro solely because he is a Negro is racial discrimination, just as much as a 'white only' employment policy. Both forms of discrimination are prohibited by title VII of this bill. The language of that title simply states that race is not a qualification for employment. . . . Some people charge that H. R. 7152 favors the Negro, at the expense of the white majority. But how can the language of equality favor one race or one religion over another? Equality can have only one meaning, and that meaning is self-evident to reasonable men. Those who say that equality means favoritism do violence to common sense." *Id.,* at 8921.

---

[20] Senator Robertson's observations prompted Senator Humphrey to make the following offer: "If the Senator can find in title VII . . . any language which provides that an employer will have to hire on the basis of percentage or quota related to color . . . I will start eating the pages one after another, because it is not in there." 110 Cong. Rec. 7420 (1964).

[21] Referring to the EEOC, Senator Smathers argued that Title VII "would make possible the creation of a Federal bureaucracy which would, in the final analysis, cause a man to hire someone whom he did not want to hire, not on the basis of ability, but on the basis of religion, color, or creed . . . ." *Id.,* at 8500. Senator Sparkman's comments were to the same effect. See n. 23, *infra.* Several other opponents of Title VII expressed similar views. See 110 Cong. Rec. 9034–9035 (1964) (remarks of Sens. Stennis and Tower); *id.,* at 9943–9944 (remarks of Sens. Long and Talmadge); *id.,* at 10513 (remarks of Sen. Robertson).

Senator Williams concluded his remarks by noting that Title VII's only purpose is "the elimination of racial and religious discrimination in employment." *Ibid.*[22] On May 25, Senator Humphrey again took the floor to defend the bill against "the well-financed drive by certain opponents to confuse and mislead the American people." *Id.,* at 11846. Turning once again to the issue of preferential treatment, Senator Humphrey remained faithful to the view that he had repeatedly expressed:

> "The title does not provide that any preferential treatment in employment shall be given to Negroes or to any other persons or groups. It does not provide that any quota systems may be established to maintain racial balance in employment. In fact, *the title would prohibit preferential treatment for any particular group,* and any person, whether or not a member of any minority group, would be permitted to file a complaint of discriminatory employment practices." *Id.,* at 11848 (emphasis added).

While the debate in the Senate raged, a bipartisan coalition under the leadership of Senators Dirksen, Mansfield, Humphrey, and Kuchel was working with House leaders and representatives of the Johnson administration on a number of amendments to H. R. 7152 designed to enhance its prospects of passage. The so-called "Dirksen-Mansfield" amendment was introduced on May 26 by Senator Dirksen as a substitute for the entire House-passed bill. The substitute bill, which ultimately became law, left unchanged the basic prohibitory language of §§ 703 (a) and (d), as well as the remedial provisions in § 706 (g). It added, however, several provisions defining and clarifying the scope of Title VII's substantive pro-

---

[22] Several other proponents of H. R. 7152 commented briefly on Title VII, observing that it did not authorize the imposition of quotas to correct racial imbalance. See *id.,* at 9113 (remarks of Sen. Keating); *id.,* at 9881–9882 (remarks of Sen. Allott); *id.,* at 10520 (remarks of Sen. Carlson); *id.,* at 11768 (remarks of Sen. McGovern).

hibitions. One of those clarifying amendments, § 703 (j), was specifically directed at the opposition's concerns regarding racial balancing and preferential treatment of minorities, providing in.pertinent part: "Nothing contained in [Title VII] shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race . . . of such individual or group on account of" a racial imbalance in the employer's work force. 42 U. S. C. § 2000e–2 (j); quoted in full in n. 8, *supra.*

The Court draws from the language of § 703 (j) primary support for its conclusion that Title VII's blanket prohibition on racial discrimination in employment does not prohibit preferential treatment of blacks to correct racial imbalance. Alleging that opponents of Title VII had argued (1) that the Act would be interpreted to require employers with racially imbalanced work forces to grant preferential treatment to minorities and (2) that "employers with racially imbalanced work forces would grant preferential treatment to racial minorities, even if not required to do so by the Act," *ante,* at 205, the Court concludes that § 703 (j) is responsive only to the opponents' first objection and that Congress therefore must have intended to permit voluntary, private discrimination against whites in order to correct racial imbalance.

Contrary to the Court's analysis, the language of § 703 (j) is precisely tailored to the objection voiced time and again by Title VII's opponents. Not once during the 83 days of debate in the Senate did a speaker, proponent or opponent, suggest that the bill would allow employers *voluntarily* to prefer racial minorities over white persons.[23] In light of Title VII's flat

[23] The Court cites the remarks of Senator Sparkman in support of its suggestion that opponents had argued that employers would take it upon themselves to balance their work forces by granting preferential treatment to racial minorities. In fact, Senator Sparkman's comments accurately reflected the opposition's "party line." He argued that while the language of Title VII does not expressly require imposition of racial quotas (no one, of course, had ever argued to the contrary), the law would be applied by

prohibition on discrimination "against any individual . . . because of such individual's race," § 703 (a), 42 U. S. C. § 2000e–2 (a), such a contention would have been, in any event, too preposterous to warrant response. Indeed, speakers on both sides of the issue, as the legislative history makes clear, recognized that Title VII would tolerate no *voluntary* racial preference, whether in favor of blacks or whites. The complaint consistently voiced by the opponents was that Title VII, particularly the word "discrimination," would be *interpreted* by federal agencies such as the EEOC to *require* the

federal agencies in such a way that "some kind of quota system will be used." *Id.,* at 8619. Senator Sparkman's view is reflected in the following exchange with Senator Stennis:

"Mr. SPARKMAN. At any rate, when the Government agent came to interview an employer who had 100 persons in his employ, the first question would be, 'How many Negroes are you employing?' Suppose the population of that area was 20 percent Negro. Immediately the agent would say, 'You should have at least 20 Negroes in your employ, and they should be distributed among your supervisory personnel and in all the other categories'; and the agent would *insist* that that be done immediately.

. . . . .

"Mr. STENNIS. . . .

"The Senator from Alabama has made very clear his point about employment on the quota basis. Would not the same basis be applied to promotions?

"Mr. SPARKMAN. Certainly it would. As I have said, when the Federal agents came to check on the situation in a small business which had 100 employees, and when the agents said to the employer, 'You must hire 20 Negroes, and some of them must be employed in supervisory capacities,' and so forth, and so on, the agent would also say, 'And you must promote the Negroes, too, in order to distribute them evenly among the various ranks of your employees.' " *Id.,* at 8618 (emphasis added).

Later in his remarks, Senator Sparkman stated: "Certainly the suggestion will be made to a small business that may have a small Government contract . . . that if it does not carry out the suggestion that has been made to the company by an inspector, its Government contract will not be renewed." *Ibid.* Except for the size of the business, Senator Sparkman has seen his prophecy fulfilled in this case.

correction of racial imbalance through the granting of preferential treatment to minorities. Verbal assurances that Title VII would not require—indeed, would not permit—preferential treatment of blacks having failed, supporters of H. R. 7152 responded by proposing an amendment carefully worded to meet, and put to rest, the opposition's charge. Indeed, unlike §§ 703 (a) and (d), which are by their terms directed at entities—*e. g.*, employers, labor unions—whose actions are restricted by Title VII's prohibitions, the language of § 703 (j) is specifically directed at entities—federal agencies and courts—charged with the responsibility of interpreting Title VII's provisions.[24]

In light of the background and purpose of § 703 (j), the irony of invoking the section to justify the result in this case is obvious. The Court's frequent references to the "voluntary" nature of Kaiser's racially discriminatory admission quota bear no relationship to the facts of this case. Kaiser and the Steelworkers acted under pressure from an agency of the Federal Government, the Office of Federal Contract Compliance, which found that minorities were being "underutilized" at Kaiser's plants. See n. 2, *supra*. That is, Kaiser's work force was racially imbalanced. Bowing to that pressure, Kaiser instituted an admissions quota preferring blacks over whites, thus confirming that the fears of Title VII's opponents were well founded. Today, § 703 (j), adopted to allay those fears, is invoked by the Court to uphold imposition of a racial quota under the very circumstances that the section was intended to prevent.[25]

---

[24] Compare § 703 (a), 42 U. S. C. § 2000e–2 (a) ("It shall be an unlawful employment practice for an employer . . ."), with § 703 (j), 42 U. S. C. § 2000e–2 (j) ("Nothing contained in this subchapter shall be interpreted . . .").

[25] In support of its reading of § 703 (j), the Court argues that "a prohibition against all voluntary, race-conscious, affirmative action efforts would disserve" the important policy, expressed in the House Report on H. R. 7152, that Title VII leave "management prerogatives, and union

Section 703 (j) apparently calmed the fears of most of the opponents; after its introduction, complaints concerning racial balance and preferential treatment died down considerably.[26] Proponents of the bill, however, continued to reassure the opposition that its concerns were unfounded. In a lengthy defense of the entire civil rights bill, Senator Muskie emphasized that the opposition's "torrent of words . . . cannot obscure this basic, simple truth: Every American citizen has the right to equal treatment—not favored treatment, not complete

freedoms . . . undisturbed to the greatest extent possible." H. R. Rep., pt. 2, p. 29, quoted *ante*, at 206. The Court thus concludes that "Congress did not intend to limit traditional business freedom to such a degree as to prohibit all voluntary, race-conscious affirmative action." *Ante*, at 207.

The sentences in the House Report immediately following the statement quoted by the Court, however, belie the Court's conclusion:

"Internal affairs of employers and labor organizations must not be interfered with *except to the limited extent that correction is required in discrimination practices*. Its primary task is to make certain that the channels of employment are open to persons *regardless of their race* and that jobs in companies or membership in unions are strictly filled on the basis of qualification." H. R. Rep., pt. 2, p. 29 (emphasis added).

Thus, the House Report invoked by the Court is perfectly consistent with the countless observations elsewhere in Title VII's voluminous legislative history that employers are free to make employment decisions without governmental interference, so long as those decisions are made *without regard to race*. The whole purpose of Title VII was to deprive employers of their "traditional business freedom" to discriminate on the basis of race. In this case, the "channels of employment" at Kaiser were hardly "open" to Brian Weber.

[26] Some of the opponents still were not satisfied. For example, Senator Ervin of North Carolina continued to maintain that Title VII "would give the Federal Government the power to go into any business or industry in the United States . . . and tell the operator of that business whom he had to hire." 110 Cong. Rec. 13077 (1964). Senators Russell and Byrd remained of the view that pressures exerted by federal agencies would compel employers "to give priority definitely and almost completely, in most instances, to the members of the minority group." *Id.*, at 13150 (remarks of Sen. Russell).

individual equality—just equal treatment." 110 Cong. Rec. 12614 (1964). With particular reference to Title VII, Senator Muskie noted that the measure "seeks to afford to all Americans equal opportunity in employment without discrimination. Not equal pay. Not 'racial balance.' Only equal opportunity." *Id.*, at 12617.[27]

Senator Saltonstall, Chairman of the Republican Conference of Senators participating in the drafting of the Dirksen-Mansfield amendment, spoke at length on the substitute bill. He advised the Senate that the Dirksen-Mansfield substitute, which included § 703 (j), "provides no preferential treatment for any group of citizens. In fact, *it specifically prohibits such treatment.*" 110 Cong. Rec. 12691 (1964) (emphasis added).[28]

---

[27] Senator Muskie also addressed the charge that federal agencies would equate "discrimination," as that word is used in Title VII, with "racial balance":

"[S]ome of the opposition to this title has been based upon its alleged vagueness [and] its failure to define just what is meant by discrimination . . . . I submit that, on either count, the opposition is not well taken. Discrimination in this bill means just what it means anywhere: a distinction in treatment given to different individuals because of their race . . . [a]nd, as a practical matter, we all know what constitutes racial discrimination." *Id.*, at 12617.

Senator Muskie then reviewed the various provisions of § 703, concluding that they "provide a clear and definitive indication of the type of practice which this title seeks to eliminate. Any serious doubts concerning [Title VII's] application would, it seems to me, stem at least partially from the predisposition of the person expressing such doubt." 110 Cong. Rec. 12618 (1964).

[28] The Court states that congressional comments regarding § 703 (j) "were all to the effect that employers would not be *required* to institute preferential quotas to avoid Title VII liability." *Ante*, at 207 n. 7 (emphasis in original). Senator Saltonstall's statement that Title VII of the Dirksen-Mansfield substitute, which contained § 703 (j), "specifically prohibits" preferential treatment for any racial group disproves the Court's observation. Further, in a major statement explaining the purpose of the Dirksen-Mansfield substitute amendments, Senator Humphrey said of

On June 9, Senator Ervin offered an amendment that would entirely delete Title VII from the bill. In answer to Senator Ervin's contention that Title VII "would make the members of a particular race special favorites of the laws," *id.,* at 13079, Senator Clark retorted:

> "The bill does not make anyone higher than anyone else. It establishes no quotas. It leaves an employer free to select whomever he wishes to employ. . . .
>
> "All this is subject to one qualification, and that qualification, is to state: 'In your activity as an employer . . . you must not discriminate because of the color of a man's skin. . . .'
>
> "That is all this provision does. . . .
>
> "It merely says, 'When you deal in interstate commerce, you must not discriminate on the basis of race . . . .'"
>
> *Id.,* at 13080.

The Ervin amendment was defeated, and the Senate turned its attention to an amendment proposed by Senator Cotton to limit application of Title VII to employers of at least 100 employees. During the course of the Senate's deliberations on the amendment, Senator Cotton had a revealing discussion with Senator Curtis, also an opponent of Title VII. Both men expressed dismay that Title VII would prohibit preferential hiring of "members of a minority race in order to enhance their opportunity":

> "Mr. CURTIS. Is it not the opinion of the Senator that any individuals who provide jobs for a class of people who have perhaps not had sufficient opportunity for jobs should be commended rather than outlawed?

---

§ 703 (j): "This subsection does not represent any change in the substance of the title. It does state clearly and accurately what we have maintained all along about the bill's intent and meaning." 110 Cong. Rec. 12723 (1964). What Senator Humphrey had "maintained all along about the bill's intent and meaning," was that it neither required *nor permitted* imposition of preferential quotas to eliminate racial imbalances.

250

"Mr. COTTON. Indeed it is." *Id.*, at 13086.[29]

Thus, in the only exchange on the Senate floor raising the possibility that an employer might wish to reserve jobs for minorities in order to assist them in overcoming their employment disadvantage, both speakers concluded that Title VII prohibits such, in the words of the Court, "voluntary, private, race-conscious efforts to abolish traditional patterns of racial

---

[29] The complete exchange between Senators Cotton and Curtis, insofar as is pertinent here, is as follows:

"Mr. COTTON. . . .

. . . .

"I would assume that anyone who will administer the laws in future years will not discriminate between the races. If I were a Negro, and by dint of education, training, and hard work I had amassed enough property as a Negro so that I had a business of my own—and there are many of them in this country—and I felt that, having made a success of it myself, I wanted to help people of my own race to step up as I had stepped up, I think I should have the right to do so. I think I should have the right to employ Negroes in my own establishment and put out a helping hand to them if I so desired. I do not believe that anyone in Washington should be permitted to come in and say, 'You cannot employ all Negroes. You must have some Poles. You must have some Yankees.' . . .

. . . . .

"Mr. CURTIS. . . .

"The Senator made reference to the fact that a member of a minority race might become an employer and should have a right to employ members of his race in order to give them opportunity. Would not the same thing follow, that a member of a majority race might wish to employ almost entirely, or entirely, members of a minority race in order to enhance their opportunity? And is it not true that under title VII as written, that would constitute discrimination?

"Mr. COTTON. It certainly would, if someone complained about it and felt that he had been deprived of a job, and that it had been given to a member of a minority race because of his race and not because of some other reason." *Id.*, at 13086.

This colloquy refutes the Court's statement that "[t]here was no suggestion after the adoption of § 703 (j) that wholly voluntary, race-conscious, affirmative action efforts would in themselves constitute a violation of Title VII." *Ante*, at 207 n. 7.

segregation and hierarchy." *Ante,* at 204. Immediately after this discussion, both Senator Dirksen and Senator Humphrey took the floor in defense of the 25-employee limit contained in the Dirksen-Mansfield substitute bill, and neither Senator disputed the conclusions of Senators Cotton and Curtis. The Cotton amendment was defeated.

### 3

On June 10, the Senate, for the second time in its history, imposed cloture on its Members. The limited debate that followed centered on proposed amendments to the Dirksen-Mansfield substitute. Of some 24 proposed amendments, only 5 were adopted.

As the civil rights bill approached its final vote, several supporters rose to urge its passage. Senator Muskie adverted briefly to the issue of preferential treatment: "It has been said that the bill discriminates in favor of the Negro at the expense of the rest of us. It seeks to do nothing more than to lift the Negro from the status of inequality to one of *equality* of treatment." 110 Cong. Rec. 14328 (1964) (emphasis added). Senator Moss, in a speech delivered on the day that the civil rights bill was finally passed, had this to say about quotas:

> "The bill does not accord to any citizen advantage or preference—it does not fix quotas of employment or school population—it does not force personal association. What it does is to prohibit public officials and those who invite the public generally to patronize their businesses or to apply for employment, to utilize the offensive, humiliating, and cruel practice of discrimination on the basis of race. In short, the bill does not accord special consideration; it establishes *equality." Id.,* at 14484 (emphasis added).

Later that day, June 19, the issue was put to a vote, and the Dirksen-Mansfield substitute bill was passed.

## C

The Act's return engagement in the House was brief. The House Committee on Rules reported the Senate version without amendments on June 30, 1964. By a vote of 289 to 126, the House adopted H. Res. 789, thus agreeing to the Senate's amendments of H. R. 7152.[30] Later that same day, July 2, the President signed the bill and the Civil Rights Act of 1964 became law.

## IV

Reading the language of Title VII, as the Court purports to do, "against the background of [its] legislative history . . . and the historical context from which the Act arose," *ante*, at 201, one is led inescapably to the conclusion that Congress fully understood what it was saying and meant precisely what it said. Opponents of the civil rights bill did not argue that employers would be permitted under Title VII voluntarily to grant preferential treatment to minorities to correct racial imbalance. The plain language of the statute too clearly prohibited such racial discrimination to admit of any doubt. They argued, tirelessly, that Title VII would be interpreted by federal agencies and their agents to require unwilling employers to racially balance their work forces by granting preferential treatment to minorities. Supporters of H. R. 7152

---

[30] Only three Congressmen spoke to the issue of racial quotas during the House's debate on the Senate amendments. Representative Lindsay stated: "[W]e wish to emphasize also that this bill does not require quotas, racial balance, or any of the other things that the opponents have been saying about it." 110 Cong. Rec. 15876 (1964). Representative McCulloch echoed this understanding, remarking that "[t]he bill does not permit the Federal Government to require an employer or union to hire or accept for membership a quota of persons from any particular minority group." *Id.*, at 15893. The remarks of Representative MacGregor, quoted by the Court, *ante*, at 207–208, n. 7, are singularly unhelpful. He merely noted that by adding § 703 (j) to Title VII of the House bill, "[t]he Senate . . . spelled out [the House's] intentions more specifically." 110 Cong. Rec. 15893 (1964).

responded, equally tirelessly, that the Act would not be so interpreted because not only does it not require preferential treatment of minorities, it also does not *permit* preferential treatment of any race for any reason. It cannot be doubted that the proponents of Title VII understood the meaning of their words, for "[s]eldom has similar legislation been debated with greater consciousness of the need for 'legislative history,' or with greater care in the making thereof, to guide the courts in interpreting and applying the law." Title VII: Legislative History, at 444.

To put an end to the dispute, supporters of the civil rights bill drafted and introduced § 703 (j). Specifically addressed to the opposition's charge, § 703 (j) simply enjoins federal agencies and courts from interpreting Title VII to require an employer to prefer certain racial groups to correct imbalances in his work force. The section says nothing about voluntary preferential treatment of minorities because such racial discrimination is plainly proscribed by §§ 703 (a) and (d). Indeed, had Congress intended to except voluntary, race-conscious preferential treatment from the blanket prohibition of racial discrimination in §§ 703 (a) and (d), it surely could have drafted language better suited to the task than § 703 (j). It knew how. Section 703 (i) provides:

> "Nothing contained in [Title VII] shall apply to any business or enterprise on or near an Indian reservation, with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation." 78 Stat. 257, 42 U. S. C. § 2000e–2 (i).

## V

Our task in this case, like any other case involving the construction of a statute, is to give effect to the intent of Congress. To divine that intent, we traditionally look first to the

words of the statute and, if they are unclear, then to the statute's legislative history. Finding the desired result hopelessly foreclosed by these conventional sources, the Court turns to a third source—the "spirit" of the Act. But close examination of what the Court proffers as the spirit of the Act reveals it as the spirit animating the present majority, not the 88th Congress. For if the spirit of the Act eludes the cold words of the statute itself, it rings out with unmistakable clarity in the words of the elected representatives who made the Act law. It is *equality*. Senator Dirksen, I think, captured that spirit in a speech delivered on the floor of the Senate just moments before the bill was passed:

". . . [T]oday we come to grips finally with a bill that advances the enjoyment of living; but, more than that, it advances the equality of opportunity.

"I do not emphasize the word 'equality' standing by itself. It means equality of opportunity in the field of education. It means equality of opportunity in the field of employment. It means equality of opportunity in the field of participation in the affairs of government . . . .

"That is it.

"Equality of opportunity, if we are going to talk about conscience, is the mass conscience of mankind that speaks in every generation, and it will continue to speak long after we are dead and gone." 110 Cong. Rec. 14510 (1964).

There is perhaps no device more destructive to the notion of equality than the *numerus clausus*—the quota. Whether described as "benign discrimination" or "affirmative action," the racial quota is nonetheless a creator of castes, a two-edged sword that must demean one in order to prefer another. In passing Title VII, Congress outlawed *all* racial discrimination, recognizing that no discrimination based on race is benign, that no action disadvantaging a person because of his color is affirmative. With today's holding, the Court introduces into

Title VII a tolerance for the very evil that the law was intended to eradicate, without offering even a clue as to what the limits on that tolerance may be. We are told simply that Kaiser's racially discriminatory admission quota "falls on the permissible side of the line." *Ante,* at 208. By going not merely *beyond,* but directly *against* Title VII's language and legislative history, the Court has sown the wind. Later courts will face the impossible task of reaping the whirlwind.