Kenneth BAKER, Arthur Bartniczak, Hanson Bratton, Patrick Jordan, Frank Krzesowik, Elbert McVay and Robert Scally, Plaintiffs in Civ. No. 5–71937,

and

Hanson Bratton, Gale Bogenn, William Shell, Patrick Jordan, Charles Mahoney, Individually and on behalf of all others similarly situated and the Detroit Police Lieutenants & Sergeants Association, Plaintiffs in Civ. No. 5–72264,

v.

CITY OF DETROIT, a Municipal Corporation, Philip G. Tannian, Chief of Police, Detroit Police Department; Coleman A. Young, Mayor, City of Detroit; and the Board of Police Commissioners, City of Detroit, Defendants,

and

Guardians of Michigan, David L. Simmons, Arnold D. Payne, James E. Crawford, Clinton Donaldson, Willie Johnson, Kenneth M. Johnson and Alfred Brooks, Intervening Defendants.

Civ. Nos. 5–71937, 5–72264.

United States District Court,
E. D. Michigan, S. D.

Sept. 25, 1979.

See also, D.C., 483 F.Supp. 930.

James P. Hoffa, Murray J. Chodak, Hoffa, Chodak & Robiner, Detroit, Mich., for plaintiffs in No. 5–71937.

K. Preston Oade, Jr., Bernard A. Friedman, Robert S. Harrison, Marc G. Whitefield, Lippit, Harrison, Perlove, Friedman & Zack, Southfield, Mich., for plaintiffs in No. 5–72264.

Beth J. Lief, Jack Greenberg, James M. Nabrit, III, O. Peter Sherwood, Napoleon B. Williams, Lowell Johnston, New York City, Barry L. Goldstein, Washington, D.C., James R. Andary, Sp. Asst. Corp. Counsel for the City of Detroit, George Matish,

Anna Diggs-Taylor, Nancy McCaughan, James Zeman, Denise Page Hood, Law Dept., City of Detroit, Detroit, Mich., for defendants.

Warren J. Bennia, New York City, for intervening defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KEITH, Circuit Judge, Sitting by Designation.

A class of white police officers and the Detroit Police Lieutenants & Sergeants Association have brought this action, alleging that they were illegally discriminated against when the City of Detroit adopted an affirmative action program whereby equal numbers of white and black police sergeants were promoted to the rank of lieutenant. In an order and opinion dated July 31, 1978, this Court denied plaintiffs' demand for a jury trial, and requested that the parties brief the issue of whether plaintiffs' claims for actual and punitive damages could withstand a motion for partial summary judgment in light of a record indicating good faith conduct by the city officials who promulgated the affirmative action program in question.

In response to this Court's invitation, on August 19, 1978, defendants moved for partial summary judgment dismissing plaintiffs' claims as to monetary damages other than back pay. Defendants' motion was argued before the Court on September 5, 1978.

### I.

Before reaching the merits of the summary judgment motion, the Court must discuss a threshold procedural objection raised by the plaintiffs. Plaintiffs contend that good faith qualified immunity is an affirmative defense which must be properly pleaded or it is waived. They further claim that a review of the pleadings establishes that defendants never asserted the affirmative defense of qualified immunity. They there-

fore conclude that defendants must be deemed to have waived the defense. Alternatively, plaintiffs claim that they have been prejudiced because this issue has not been raised previously and assert a need to develop additional discovery.

This Court will assume, without deciding, that good faith immunity is an affirmative defense which must be pleaded and proved by the defendant. *Compare Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) (district court's grant of a threshold summary judgment motion on good faith immunity grounds upheld) *with Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53, 61–62 (3rd Cir., cert. denied 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976)). ("[S]ince good faith was a matter of defense it could not be determined on Rule 12(b)(6) motion.")

■ The requirement that affirmative defenses be specifically pleaded is based on notions of fair play. A party should not have to deal with an extraneous issue in a lawsuit unless it is specifically brought to his attention. At the same time, hypertechnicality in pleading requirements should be avoided. Thus, liberal pleading rules are equally applicable to the pleading of affirmative defenses. *See* 2A Moore's Federal Practice Par. 8.27(3). More important, what matters is not whether the magic words "affirmative defense" appears in pleadings, but whether the Court and the parties were aware of the issues involved. *See Backar v. Western States Producing Company*, 547 F.2d 876, 881 (5th Cir. 1977).

■ It is clear to this Court that the issue of the good faith immunity of the officials being sued in this case has been at all times properly before the Court. Initially, it is clear that the defendants' good faith is inherent to their affirmative defenses that the promotions in question were made in compliance with the United States Constitution, Civil Rights Acts, and the Charter of the City of Detroit in order to counteract a hiring and promotional system which in the past had discriminated against blacks. These defenses clearly set forth legal

grounds for a claim of governmental immunity. That is, that the actions taken by the defendants were consistent with the law and indeed were meant to comply with the law and were in no way malicious or based on bad faith.

If there were any doubt as to this, plaintiffs themselves have removed it. In February of 1977, the *Bratton* plaintiffs amended their complaint and added specific allegations of willful, knowing, and intentional discrimination. It was via this amended complaint that the *Bratton* plaintiffs for the first time, raised the issue of actual and punitive damages. Indeed, the basis raised for punitive damages was that defendant had initiated the affirmative action program with full knowledge that it was illegal. *See Bratton* complaint, paragraph 5. In response, defendants specifically denied each and every allegation made. In light of the above, the Court has no trouble concluding that the instant motion for summary judgment is properly before it.

## II.

The good faith immunity test which is applicable here was recently restated by the Supreme Court in *Procunier v. Navarette*, 434 U.S. 555, 562, 566, 98 S.Ct. 855, 860, 862, 55 L.Ed.2d 24 (1978):

"If the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm"; or "where the official has acted with 'malicious intention' to deprive the plaintiff of a constitutional right or to cause him 'other injury.'"

There is no doubt that defendants are entitled to immunity under the first prong of the test articulated above. This case concerns a voluntary race-conscious promotion program instituted by the Detroit Board of Police Commissioners. Contrary to plaintiffs' continued assertions, it is not clear now nor was it clear in 1974 and 1975 when the Board first acted, that a voluntary affirmative action program relating to promotions of public employees is illegal.

Numerous cases have repeatedly held that numerical race-conscious remedies may be imposed to eradicate the effects of past discriminatory employment practices. *See Davis v. County of Los Angeles*, 566 F.2d 1334, 1342–43 (9th Cir. 1977), *vacated as moot*, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) and cases cited. Plaintiffs cannot deny that they would have no cause to complain if this affirmative action program had been imposed by a court pursuant to a lawsuit brought by the EEOC or by black policemen. It is the voluntary, extra-judicial nature of this program which subjects it to question in this forum. Voluntary affirmative action was struck down in *Weber v. Kaiser Aluminum Company*, 563 F.2d 216 (5th Cir. 1977), *Reeves v. Eaves*, 411 F.Supp. 531 (M.D.Ga.1976) and *Chmill v. City of Pittsburgh*, 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977). However, it was upheld in *Germann v. Kipp*, 429 F.Supp. 1323 (W.D.Mo.1976), *vacated as moot*, 572 F.2d 1258 (8th Cir. 1978); *Lindsay v. City of Seattle*, 86 Wash.2d 698, 548 P.2d 320 (1976), *cert. denied* 429 U.S. 886, 97 S.Ct. 237, 50 L.Ed.2d 167 (1976); *Hutchinson Commission v. Midland Credit Management, Inc.*, 213 Kan. 399, 517 P.2d 158 (1973). The Supreme Court's recent decision in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), five years after the City first promulgated the affirmative action program under attack here, makes it clear that under some circumstances, voluntary race-conscious affirmative action programs are allowable. Even if the city's program under attack in this litigation is determined to be unreasonable, it cannot be said that the City defendants ever acted contrary to known law.

*Weber* dealt with a private employer's affirmative action program and found that Title VII's prohibition of racial preference did not always bar a voluntary preference in favor of blacks. A Title VII claim is present in this case as well, but additional statutory and constitutional issues are present because the City is a public entity subject to the command of Title VI of the

Civil Rights Act and the Fourteenth Amendment to the Constitution. The limitations on voluntary race-conscious promotional efforts under Title VI and the Fourteenth Amendment are unsettled. One need look no further than the close division of the Justices in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) to see that this is true.

This Court is aware that another district judge of this bench has recently ruled that the city's voluntary affirmative action program was *per se* illegal as a matter of constitutional and statutory law. *Detroit Police Officers Association v. Young*, 446 F.Supp. 979 (E.D.Mich.1978). This Court notes, however, that a preliminary injunction entered by that court prior to making its final determination was dissolved by the Sixth Circuit. *Id.* at 986. Further, in *Detroit Fire Fighters Association, Local No. 344 v. Dixon*, 572 F.2d 557, 559 (6th Cir. 1978), the Court of Appeals for the Sixth Circuit declined to rule upon a voluntary affirmative action program instituted by the City of Detroit regarding its fire fighting personnel because the controversy was moot. Significantly, even though the Sixth Circuit did not reach the merits of the issue presented, it did state that the constitutional issues were "difficult."

The purpose of the good faith immunity defense is to give public officials broad leeway in decision-making, even if in retrospect the decision turns out to be wrong. As the Supreme Court pointed out when discussing the good faith defense of school board members:

" '[I]f the work of the schools is to go forward; 'there must be a degree of immunity so that 'public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all circumstances will not be punished and that they need not exercise their discretion with undue timidity.' "

*Procunier v. Navarette, supra*, 434 U.S. at 562, 98 S.Ct. at 860, *quoting Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

Given the unsettled nature of the law in this area, it would be unjust and contrary to the above-stated policy to inflict monetary damages on the defendant Detroit officials who promulgated the affirmative action program in question.

### III.

The only basis on which plaintiffs can avoid summary judgment on the good faith issue is under the second prong of the good faith immunity test. That is, whether the Detroit public official defendants acted with "malicious intention" to deprive plaintiffs of their constitutional rights or to cause them "other injury."

█ The meaning of this prong of the good faith immunity test is not clear. The court in *Procunier v. Navarette, supra*, 434 U.S. at 566, 98 S.Ct. at 862 indicated that "This part of the [good faith] rule speaks of 'intentional injury,' contemplating that the actor intends the consequences of his conduct. See Restatement 2d of Torts, Section 8A [1965]." Mr. Justice Stevens, in dissent, explained that this section meant that "an official steps outside his proper role when he uses his powers to inflict constitutional or other harm on an individual for reasons unrelated to the performance of his duty." *Procunier v. Navarette, supra*, at 571, 98 S.Ct. at 864-65 (Stevens, J., dissenting). To be subject to monetary damages under this prong, the public official in question must specifically and maliciously intend to harm the plaintiff. *See Bogard v. Cook*, 586 F.2d 399, 420 (5th Cir. 1978).

█ An examination of the undisputed facts of this case reveals no basis for plaintiffs' assertions that the defendants acted maliciously. This affirmative action program was not imposed overnight by a reckless official. An examination of the decision-making process which culminated in the adoption of the affirmative action program reveals that there is no genuine issue of material fact about the defendants' good faith.

A review of the complaints, depositions, exhibits and affidavits reveals that there is no dispute as to the following:

1. On July 11, 1974, a new City Charter for the City of Detroit became effective which required the Mayor to appoint a five-member Board of Commissioners.

2. The functions of the Board of Police Commissioners include, *inter alia*, the approval of all promotions within the Detroit Police Department.[1]

3. The first meeting of the Board of Police Commissioners was held on July 22, 1974.[2]

4. At the July 22, 1974 meeting, then Chief of Police Tannian made a presentation to the Board. He claimed that there was a need for an affirmative action promotional plan because of the Department's prior history of discrimination and the Department's operational need for more black lieutenants.[3] The stated purposes of the proposed affirmative action program were to remedy prior discriminatory employment practices; to overcome the present barriers to the promotion of blacks in the promotional model then in operation; and to satisfy the operational needs of the Police Department for greater numbers of black lieutenants.[4]

5. Legal Counsel for the City of Detroit informed the Board that he had concluded there was an overwhelming case of de facto discrimination that compelled the City, pursuant to the Civil Rights Act, the United States and Michigan Constitutions and the Charter of the City of Detroit to take corrective affirmative action.[5] The Board relied upon the advice of counsel that the proposed affirmative action plan was legal.[6]

6. The Board tabled the proposal for the affirmative action program on July 22, 1974. At the next meeting of the Board on July 26, 1974, several speakers offered their personal and organizational views of the affirmative action program to the Board, including Robert Peterson, President of the Sergeants and Lieutenants Association. The Board decided to reconvene on July 31, 1974, to determine whether or not to adopt the affirmative action program.[7]

7. At the July 31, 1974, meeting, the Board was specifically asked if the reason for the affirmative action plan was based only on the past hiring practices as regards black officers. The Chairman of the Board answered that it was not and that the Board believed, that there was definitely evidence of discrimination within the Detroit Police Department promotional process.[8] The Board studied the promotional model for promotion to the rank of lieutenant and concluded that the model had an adverse impact on minorities.[9]

8. After hearing the views of several speakers, the Board of Police Commissioners on July 31, 1974, unanimously adopted the affirmative action program by resolution which provided:

"It has been determined that the Detroit Police Department has submitted that de facto discrimination exists in the hiring of Blacks and other minority groups as police officers contrary to the U.S. and Michigan Constitutions, the Charter of the City of Detroit, and the Civil Rights Acts.

It has also determined from those facts that de facto discrimination exists in the promotion of Blacks and other minority groups to supervisory positions in the Detroit Police Department contrary to U.S. and Michigan Constitutions, the charter of the City of Detroit, and the Civil Rights Acts.

1. Charter of the City of Detroit, Chapter II, Section 7–1114.

2. Minutes of the Board of Police Commissioners (hereinafter "Minutes"), July 22, 1974.

3. *Id.* at pp. 11–13, 20.

4. Affidavit of Edward J. Littlejohn, ¶ 6.

5. Minutes, July 22, 1974, pp. 22–25.

6. Minutes, July 22, 1974, pp. 22–23.

7. Minutes, July 26, 1974, p. 2.

8. Minutes, July 31, 1974, p. 4.

9. Deposition of Edward J. Littlejohn, p. 31.

It is necessary because of past and present discrimination in the hiring and promotional policies of the Detroit Police Department that this Board establish an Affirmative Action policy that will guarantee to every individual who is now a police officer or who intends to pursue a career as a police officer, a policy of equality in hiring and in promotion and most importantly, an Affirmative Action Program of enforcement to support that policy.

The U.S. Constitution, the Michigan Constitution, the Charter of the City of Detroit, the Civil Rights Acts, and the overwhelming moral principle of equality compels this Board to take Affirmative Action to guarantee to all persons equality in their promotional and hiring rights.

THEREFORE, BE IT RESOLVED, that the Chief of Police is instructed to take immediate Affirmative Action to eliminate any discriminatory hiring practices that systematically exclude minority groups from being appointed as Detroit Police Officers, and

BE IT FURTHER RESOLVED, that the Chief of Police take Affirmative Action to promote minorities from the existing promotional lists, and

BE IT FURTHER RESOLVED, that the Chief of Police establish criteria, with weighted component parts, used to establish promotional lists that are nondiscriminatory with respect to minority groups and

BE IT FURTHER RESOLVED, that the Chief of Police shall regularly report to the Board of this Affirmative Action policy in order that this Board may reevaluate and, if necessary, order additional action that may have to be taken."

9. On November 4, 1975, the Board adopted the following resolution on the Continued Implementation of Affirmative Action Policy:

WHEREAS:

1. This Board did adopt on July 31, 1974, an Affirmative Action Resolution.

2. The Chief of Police has filed this date with this Board certification that in order to achieve the objectives established by the July 31, 1974, Affirmative Action Resolution, it is necessary to continue this policy to promote members of the protected class to the rank of lieutenant; and the Chief of Police has also filed statistical data to support that certification.

3. This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit.

4. This Board recognizes that in the acceptance of Federal Funds from the Law Enforcement Assistance Administration, the Department is required to comply with guidelines established by that organization in regard to proportionate representation of members of the protected class.

5. This Board remains committed to its policy of equality to all persons in its promotional and hiring practices; additionally, this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department.

THEREFORE, BE IT RESOLVED BY THE BOARD OF POLICE COMMISSIONERS THAT:

1. The Chief of Police is authorized and instructed to establish a promotion list for the rank of lieutenant as furnished to this Board on this date by the Chief of Police.

2. The Chief of Police is authorized and instructed to take Affirmative Action to promote members of the protected class from the list established pursuant to Paragraph 1 of this Resolution and Section 7–1114 of the Charter of the City of Detroit which permits the Chief of Police to pass over members on the eligibility

register after the Chief of Police files with this Board written reasons acceptable to this Board; to which the Chief of Police has complied."

10. On December 14, 1975, Chief of Police Tannian made an extensive presentation to the Board on the need for continuing the affirmative action program, including a presentation of documentary evidence and legal mandates for affirmative action.[10]

11. On December 28, 1975, the Board adopted the following resolution:

"WHEREAS:

1. This Board did adopt on July 31, 1974, an Affirmative Action Resolution; and did reaffirm that action on November 4, 1975.

2. The Chief of Police has filed this date with this Board certification that in order to achieve the objectives established by the July 31, 1974, Affirmative Action Resolution, it is necessary to promote members of the protected class to the rank of lieutenant; and the Chief of Police has also filed statistical data to support that certification.

3. This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit.

4. This Board recognizes that in the acceptance of Federal Funds from the Law Enforcement Assistance Administration, the Department is required to comply with guidelines established by that organization in regard to proportionate representation of members of the protected class.

5. This Board remains committed to its policy of equality to all persons in its promotional and hiring practices; additionally, this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department.

THEREFORE, BE IT RESOLVED BY THE BOARD OF POLICE COMMISSIONERS THAT:

1. The Chief of Police is authorized and instructed to establish a promotion list for the rank of lieutenant as furnished to this Board on this date by the Chief of Police.

2. The Chief of Police is authorized and instructed to take Affirmative Action to promote members of the protected class from the list established pursuant to Paragraph 1 of this Resolution and Section 7–1114 of the Charter of the City of Detroit which permits the Chief of Police to pass over members on the eligibility register after the Chief of Police files with this Board written reasons acceptable to this Board; to which the Chief of Police has complied."

12. On April 27, 1977, the Board again reviewed the hiring and promotional patterns of the Police Department as well as the federal guidelines of the Law Enforcement Assistance Administration, Federal Revenue Sharing, the United States Equal Employment Opportunity Commission, and the Michigan Civil Rights Commission. Members of the Board reiterated that the Affirmative Action Program was and will be reviewed to determine whether the present effects of past discrimination have been as completely eradicated as possible.[11]

13. On April 28, 1977, the Board adopted a Resolution for Continued Implementation of Affirmative Action Policy which states, *inter alia* :

WHEREAS:

1. This Board did adopt on July 31, 1974, an Affirmative Action Resolution; and did reaffirm that action on November 4, 1975, and December 28, 1975.

10. Minutes, December 14, 1975, and attachments thereto.

11. Minutes, April 27, 1977.

2. This Board is advised by legal counsel that a continuing Affirmative Action Program to promote members of the protected class is consistent with the Department's and City's obligations under existing court orders, applicable collective bargaining agreement, the Constitutions and Statutes of the United States and the State of Michigan and the Charter of the City of Detroit.

3. This Board recognizes that in the acceptance of Federal Funds, from the Law Enforcement Assistance Administration, the Department is required to comply with the guidelines established by that organization in regard to proportionate representation of members of the protected class.

4. This Board remains committed to its policy of equality to all persons in its promotional and hiring practices, additionally this Board will continue with its Affirmative Action Policy to undo and eliminate the effects of historical discriminatory hiring and promotional practices of the Detroit Police Department.

The above undisputed facts paint a picture of careful, reasoned decision-making. It is clear to the Court that the Board of Police Commissioners did not lightly adopt any of the resolutions concerning the Police Department's affirmative action program, but carefully examined past practices, current needs, and the legal justification for the program.

The Court emphasizes two significant considerations. First, that whatever the adverse impact of affirmative action on whites, there is no question that the program greatly helped black officers. Thus, this is unlike a case where public officials act solely to *deprive* someone of a right. Here, public officials chose to help members of one of two competing classes. There is a palpable basis for the Board's statements that it was not acting to hurt anyone, but to help members of a disadvantaged class. The Board may have been right or wrong in this decision, but this Court sees no evidence of malice on a record which shows that public hearings were held, all parties were heard and that the Board then chose to favor blacks upon finding that blacks had been subject to past discrimination. This Court cannot find malice in a decision which helped a black minority upon a finding that it had been discriminated against in the past, simply because that would inevitably hurt the white majority. The good faith immunity defense is meant to protect public officials who make difficult choices such as those presented here.

All affirmative action programs have some adverse effect on whites who must step aside so that blacks may be hired or promoted. The Board of Police Commissioners was well aware of this, but made the reasoned decision that promoting blacks was not unjust in the light of past discrimination since no one had a right to be promoted and since it considered the black and the white candidates to be equally qualified. The Board concluded that the larger need of the City for Black Officers and the need to offset the effects of past discrimination mandated the affirmative action promotional model. The Board may have been right or wrong in its conclusions, (that is the principal question before this court), but it is clear that it acted in good faith.

Secondly, the Court notes the prominence of the Board's membership. For example, two of the members in 1975 were Edward Littlejohn and Avern Cohen. Mr. Littlejohn is a Professor of Law at Wayne State University. Mr. Cohen is a prominent attorney in Detroit, who has recently been nominated as a Federal District Judge. For plaintiffs to say that these persons acted out of deliberate malice against white police officers defies belief.

In sum, in light of the unsettled nature of the legal issues, the public hearings held by the Board, the beneficial effects of the Board's actions on blacks, and the prominence of the Board's membership, plaintiffs must make some kind of showing to demonstrate even the remote possibility of malice. *Compare* the factors which need be considered to show discriminatory intent by a public body under the 14th Amendment. *Arlington Heights v. Metropolitan Housing*

*Corp.*, 429 U.S. 252, 264–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

■ Plaintiffs seek to make this showing in various ways. First, plaintiffs argue that no good faith immunity defense should be allowed in a case involving racial discrimination, relying upon *Curry v. Gillette*, 461 F.2d 1003, 1005 (6th Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972).

This argument ignores that fact that the affirmative action program here was adopted to aid a minority group which the Board found to have been the victim of past discrimination. The cases relied upon by plaintiffs *Bakke, supra* and *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) to the effect that discrimination against whites is the equivalent of discrimination against blacks, did not discuss the issue of affirmative action, where a finding of past discrimination was made. Indeed, Mr. Justice Powell carefully noted in the *Bakke* case that, there had been "no determination by the legislature *or a responsible administrative agency* that the University engaged in a discriminatory practice requiring remedial efforts." *Bakke, supra*, 98 S.Ct. at 2756 (Opinion of Powell, J.) (emphasis added). *See also, Weber, supra; McDonald, supra*, 427 U.S. at 281 n. 8, 96 S.Ct. at 2579 n. 8 (". . . we emphasize that we do not consider here the permissibility of [an affirmative action] program, whether judicially required or otherwise prompted").

Plaintiffs next proceed to attack the quality of the Board's data and factfinding, alleging that Police Chief Tannian's presentation to the Board was deficient and contradictory to assertions which the department made to the Law Enforcement Assistance Administration. This position is supported by the findings of another District Judge in this District who concluded that:

> "Tannian neglected to paint the full picture in his presentations to the board regarding these factors and that the BPC failed to fulfill their duty to investigate the factual matters as presented by Tannian."

*Detroit Police Officer's Ass'n v. Young*, 446 F.Supp. 979, 997 (E.D.Mich.1978). The above finding however, clearly speaks of negligence and failure to perform one's duty. At best, plaintiff's allegations establish negligence, not malice. And, as *Procunier v. Navarette, supra*, 434 U.S. at 566, 98 S.Ct. 855, makes clear, negligence is insufficient to establish bad faith under the second prong of the good-faith immunity test.

Plaintiffs' other allegations are similarly insufficient. Plaintiffs argue that the Board's legal advice was deficient and that the Board's actions were procedurally deficient in that none of the testimony before the Board was under oath and the Board conducted no independent investigation. This ignores the fact that public hearings were held at which plaintiffs, among others, were allowed to present their case. More importantly, plaintiffs' point to no *requirement* that testimony be under oath or that an independent investigation be taken. Procedural informality is the hallmark of administrative proceedings as opposed to judicial proceedings. Again, even assuming that everything plaintiffs say is true and making all inferences in their favor, there is no indication of malice, only of negligence.

Plaintiffs further argue that Commissioner Cohen was unfamiliar with the case law in this area and that Defendant Tannian used incorrect labor market statistics when he compared the racial composition of the City of Detroit with the racial composition of the police department. Plaintiffs additionally maintain that there was no evidence before the Board of past discrimination in promotions and that Detroit Mayor Coleman Young made a statement showing malice when he allegedly stated: "I say that's the way to handle discrimination—reverse it!"

These allegations fall far short of indicating any malice. Although one may second guess legal opinion and the quality of legal research, it is undisputed that the Board received legal advice from counsel for the city approving its actions and that the Board, including attorney members Cohen and Littlejohn, examined the affirmative

action program carefully before approving it. In response to plaintiffs' charge that a finding of past discrimination in promotions must be made, the Court notes that the Seventh Circuit has approved race-conscious affirmative action promotions of Hispanics even in the absence of a finding of past discriminatory promotions as to Hispanics. *See United States v. City of Chicago,* 549 F.2d 415, 437 n. 30 (7th Cir.) *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977).

■ Regarding the proper labor market to be used, the Court notes that there is no ready test to apply; careful factfinding must be made. *See Hazelwood School District v. United States,* 433 U.S. 229, 310–313, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). There is nothing inherently wrong with Chiefs Tannian's and Hart's presentations to the Board of Police Commissioners because they relied on general comparisons between the minority population of the City of Detroit and the minority population of the Detroit Police Department. The Supreme Court has specifically approved comparisons between an employer's workforce and the general population, stating that such comparisons can provide "significant" proof of intentional discrimination. *Internat'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337 n. 17 and 339–40 n. 20, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As the Supreme Court noted in *Hazelwood, supra,* 433 U.S. at 308 n. 13, 97 S.Ct. 2736, general population figures are appropriate for positions which do not require special qualifications. In such cases, it is reasonable to infer that qualified minorities should roughly mirror the minority population in the surrounding community.

Courts have looked to comparisons of the percentage of minority residents in the service area (here the City of Detroit) and the percentage of minorities employed when considering discrimination claims involving municipal police and fire departments. *See Afro-America Patrolman's League v. Duck,* 503 F.2d 284, 299 (6th Cir. 1974); *United States v. City of Buffalo,* 457 F.Supp. 612, 621 (W.D.N.Y.1978); *League of United Lat-*

*in American Citizens v. City of Santa Ana,* 410 F.Supp. 873, 896–8 (C.D.Cal.1976). Similarly, courts which have ordered affirmative-action relief have also looked to the minority population in the service area. A leading case taking this approach is *NAACP v. Allen,* 493 F.2d 614 (5th Cir. 1974). There, the Fifth Circuit approved an order entered by then District Judge Frank Johnson requiring that the Alabama Department of Public Safety hire state troopers on a 50/50 black-white basis until 25% of state troopers were black. The Court specifically noted that the population of Alabama was 26.2% black. *Id.* at 617 n. 3. *Compare* this court's finding in *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87, 122 n. 4 (E.D.Mich.1973) that a reasonable affirmative action goal for an employer in the Detroit Metropolitan area was a 30% black workforce. See also, the Law Enforcement Assistance Administration's Equal Employment Opportunity Development Manual 13 (1974), *citing* 28 C.F.R. § 42.306, which states: "A significant disparity between minority representation in the service population and the minority representation in the agency workforce may be deemed to exist if the percentage of a minority group in the employment of the agency is not at least seventy (70) percent of the percentage of that minority in the service population." This provision was specifically cited to the Board of Police Commissioners.

Finally, the Court can see no malice in the alleged statement by Mayor Young, nor are any allegations made concerning the effect of this statement on the Board of Police Commissioners.

In light of all of the circumstances and the specific affidavits denying any malicious intent, plaintiffs cannot rest on their pleadings, but must advance some basis to show material facts in dispute. *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). This they have failed to do.

### IV.

■ It is true that some courts have stated that the question of good faith immunity

is "ordinarily a question for the jury." *Landrum v. Moats*, 576 F.2d 1320 (8th Cir. 1978). *See also Duchesne v. Sugarman*, 566 F.2d 817, 883 (2d Cir. 1977). However, the Supreme Court approved a grant of summary judgment on the basis of good-faith immunity in *Procunier v. Navarette, supra*, under circumstances similar to those here; that is, where the constitutional right allegedly infringed could not be said to have been "clearly established," and where plaintiff's claims, at most, showed negligence and not malice. Also, in *Butz v. Economou*, 98 S.Ct. 2894, 2911 (1978), the Supreme Court spoke in strong language of the usefulness of summary judgment when public officials are sued for money damages. *See also Hanna v. Drobnick*, 514 F.2d 393 (6th Cir. 1975) (Affirming grant of summary judgment based on good faith immunity).

This case is similar to *Kreft v. Pataky*, 595 F.2d 1224 (6th Cir. 1979) where the court found that an affidavit outlining the objective reasonableness of a public official's conduct constituted evidence from which the official's subjective good faith could be inferred. Absent specific countervailing facts showing malice, the Court did not let plaintiff rest on his pleadings, but affirmed the entry of summary judgment against him.

Affirmative action may or may not be proper in various factual contexts, but this record reveals no genuine issue of material fact as to the good faith of the officials who brought it about in this case. If it is ultimately determined that plaintiffs' rights were violated, they will be entitled to reinstatement and/or back pay. Given the unsettled nature of the law in this area and the clearly non-malicious conduct of the city officials, plaintiffs should not also be entitled to recover actual or punitive damages.

Procedurally, this motion for summary judgment has not been ruled upon until after trial on the issue of liability.[12] This is because of the Court's crush of work on the Court of Appeals as well as the time required by the trial itself. The Court has been careful to consider only pre-trial materials in making its ruling. Nonetheless, the Court parenthetically notes that nothing developed at trial does anything but support this ruling. This is a paradigm case of the usefulness of summary judgment to protect good faith actions by public officials.

Defendants motion for partial summary judgment is GRANTED. It is so ORDERED.

---

12. By stipulation, trial on the issue of liability was severed from trial on the issue of damages.